No. 103,727

STATE OF KANSAS, *Appellee*, v. CHRISTOPHER D. BRITT, *Appellant*.

(287 P.3d 905)

Opinion filed November 2, 2012.

*Lydia Krebs*, of Kansas Appellate Defender Office, argued the cause and was on the brief for appellant.

*Steven J. Obermeier*, assistant district attorney, argued the cause, and *Stephen M. Howe*, district attorney, and *Derek Schmidt*, attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

MORITZ, J.: Christopher D. Britt appeals his Jessica's Law convictions for rape, aggravated sodomy, and aggravated indecent liberties. He contends all three convictions must be reversed because the evidence was insufficient to support a finding of guilt on each of the alternative means for committing the crime on which the jury was instructed. Applying *State v. Brown*, 295 Kan. 181, 284 P.3d 977 (2012), we conclude none of the complained of jury instructions included alternative means. Britt also argues that three separate statements by the prosecutor constitute misconduct. While we conclude one of the complained of statements was improper, we find the error is not reversible.

Britt also raises a constitutional challenge to his life sentence, arguing it violates § 9 of the Kansas Constitution Bill of Rights. Applying the three-part test of *State v. Freeman*, 273 Kan. 362, 367, 574 P.2d 950 (1978), we conclude Britt's sentence does not violate our constitution. Finally, we agree that the district court erred in imposing lifetime postrelease. We affirm Britt's convictions but vacate the imposition of lifetime postrelease supervision.

FACTS AND PROCEDURAL HISTORY

On July 16, 2006, D.B. married Christopher Britt. Around December 12, 2006, D.B., her two children, and Britt moved to Overland Park, Kansas from Kansas City, Missouri. In March of 2007, Britt apparently was unemployed and took over household duties while D.B. worked.

On December 31, 2007, D.B. and Britt had a domestic dispute. During the dispute Britt threatened to kill D.B. and slammed a car door on her leg. Britt was charged with and eventually pled guilty to criminal threat, domestic battery, and misdemeanor assault.

In early January 2008, while Britt was in jail on domestic dispute charges, D.B.'s 9-year-old daughter, A.C., disclosed to her mother that Britt tried to kiss her and rub her genitals. A.C. gave her mother a piece of paper on which she had written that Britt made her "suck his middle part." D.B. took her daughter for a sexual assault examination and later a "safe talk" interview at Sunflower House on January 7, 2008.

Jennifer Coughlin, a forensics interviewer, conducted the Sunflower House interview. During the interview, A.C. stated that Britt touched the inside of her middle part approximately 6 to 10 times; placed his middle part in her middle part approximately 20 times, and made her suck his middle part approximately 30 times. Occasionally, A.C. would elect to write out her answers to Coughlin's questions. Her written answers were admitted into evidence at trial. Some of A.C.'s most graphic statements were made in writing, e.g., Britt made her "suck his middle part" and it was "nasty stuff that I don't want to taste." A.C. also wrote that during the forced fellatio "[Britt's] body [was] jumping like [a] grasshopper."

The State charged Britt with rape, aggravated criminal sodomy, and aggravated indecent liberties with a child. At trial, A.C., now 11 years old, testified that Britt touched the inside and outside of her middle part, made her suck his middle part, and kissed her breasts and mouth. A.C. stated that Britt's penis never penetrated her vagina. But she stated that Britt rubbed his penis "on the outside, on the edge" of her "private part."

Stephanie Strout conducted A.C.'s sexual assault examination which revealed no signs of trauma or healed trauma. But Strout testified that the hymen usually heals within 72 hours of trauma, leaving no sign of the prior trauma. Because A.C.'s sexual assault examination was completed more than 72 hours after the last alleged assault, Strout opined that the lack of trauma was not probative of whether an assault occurred. Britt's expert witness, Dr. William Logan, reviewed the examination report and largely agreed with Strout. He concluded that the examination "[d]oesn't prove anything one way or the other, standing alone."

Britt testified and denied that any abuse occurred. The jury returned a guilty verdict on all charges.

The rape instruction required the jury to find that Britt was over the age of 18. But no age element was included in the instructions for the two other charged crimes. Consequently, at sentencing the State asked the court to sentence Britt to the grid for the nonrape counts under this court's reasoning in *State v. Bello*, 289 Kan. 191, 211 P.3d 139 (2009). The district court obliged and imposed consecutive sentences of life with a mandatory minimum sentence of 618 months for the Jessica's Law rape charge, and grid sentences of 123 months and 61 months for the sodomy and aggravated indecent liberties charges, respectively. At the time of his sentencing, Britt's criminal history score was a B. Therefore, under K.S.A. 21-4643(a)(2)(B), Britt's mandatory minimum sentence was between 554 and 618 months. Britt timely appealed.

## ALTERNATIVE MEANS

Britt raises alternative means challenges to his aggravated sodomy, aggravated indecent liberties, and rape convictions. "Issues of statutory interpretation and construction, including issues of whether a statute creates alternative means, raise questions of law reviewable de novo on appeal." *Brown*, 295 Kan. 181, Syl. ¶ 6.

### Aggravated Sodomy

Britt argues his aggravated sodomy conviction must be reversed because the evidence was insufficient to support a finding of guilt

on each of the alternative means for committing the crime on which the jury was instructed.

We recently analyzed and developed a framework for considering sufficiency of the evidence claims when the defendant asserts the evidence of alternative means was insufficient to establish each alternative means. *Brown*, 295 Kan. at 200-01. In *Brown*, we noted that in past decisions we have applied a "super-sufficiency" requirement for evidence in alternative means cases. Under that analysis, when a single criminal offense may be committed by alternative means, jury unanimity is not required as to the means by which the crime was committed as long as substantial evidence supports each alternative means set out in the jury instructions. If the evidence is insufficient on one or more of the means on which the jury has been instructed, the conviction must be reversed. *Brown*, 295 Kan. at 200-02.

But in *Brown*, we recognized a preliminary step to be applied before considering the super-sufficiency requirement. That preliminary step requires that we identify whether the criminal statute supporting the charged crime is an alternative means statute. 295 Kan. at 200. To make that determination, we first consider whether an "or" separates alternative means or separates "options within a means." 295 Kan. at 201. Only if that language is ambiguous do we rely on legislative history or background considerations that speak to legislative purpose, or apply canons of statutory construction. See 295 Kan. at 201; *Double M Constr. v. Kansas Corporation Comm'n*, 288 Kan. 268, 271-72, 202 P.3d 7 (2009). We held in *Brown*:

"In examining legislative intent, a court must determine for each statute what the legislature's use of a disjunctive 'or' is intended to accomplish. Is it to list alternative distinct, material elements of a crime—that is, the necessary *mens rea, actus reus*, and, in some statutes, a causation element? Or is it to merely describe a material element or a factual circumstance that would prove the crime? The listing of alternative distinct, material elements, when incorporated into an elements instruction, creates an alternative means issue demanding super-sufficiency of the evidence. But merely describing a material element or a factual circumstance that would prove the crime does not create alternative means, even if the description is included in a jury instruction." 295 Kan. at 194.

As we explained in *Brown,* the legislature typically signals its intent to state alternative means through structure, separating alternatives into distinct subsections of the same statute. However, the legislature may also list additional alternatives or options within a single means of committing the crime. These "options within a means" do not constitute alternative means themselves if they do not state additional and distinct ways of committing the crime, that is, if they do not require proof of at least one additional and distinct material element. *Brown,* 295 Kan. at 196.

Returning to the specifics of this appeal, Britt challenges his aggravated sodomy conviction arguing the State presented insufficient evidence to demonstrate that he engaged in oral contact with, or oral penetration of, A.C.'s *female genitalia.* Britt claims the only evidence of sodomy the State presented was A.C.'s testimony that Britt forced her to "suck" *his* "middle part." The State, without the benefit of this court's clarification of alternative means in *Brown,* appears to concede that it failed to present evidence of alternative means of committing aggravated sodomy, but argues the error was harmless.

Rather than accept this apparent concession, we will first apply the framework of *Brown* to determine whether the criminal statute supporting the charged crime is an alternative means statute.

At the time of the offense, K.S.A. 2010 Supp. 21-3506(a) provided: "Aggravated criminal sodomy is: (1) Sodomy with a child who is under 14 years of age." Britt contends the definition of sodomy in K.S.A. 21-3501(2), states alternative means of committing the crime of aggravated sodomy. That definition states: " 'Sodomy' means oral contact or oral penetration of the female genitalia or oral contact of the male genitalia; anal penetration, however slight, of a male or female by any body part or object; or oral or anal copulation or sexual intercourse between a person and an animal." Similarly, the jury was instructed that for purposes of this case "sodomy means 'oral contact or oral penetration of the female genitalia or oral contact of the male genitalia.' "

The *actus reus* of aggravated criminal sodomy under K.S.A. 2010 Supp. 21-3506(a)(1) is the defendant's act of sodomy with a child who is under 14 years of age. The definition of sodomy, K.S.A. 21-

3501(2), creates three alternative means of committing sodomy: (1) oral contact with male or female genitalia; (2) anal penetration of a male or female; and (3) sexual acts between a person and an animal.

But the specific definition of oral contact used in the statute—"oral contact or oral penetration of the female genitalia or oral contact of the male genitalia"—does not contain alternative means. Instead, the definition refers to various types of oral contact of either the male or female genitalia. While we note that the definition refers to both oral "contact" and oral "penetration" of the female genitalia, since oral penetration of the female genitalia would seemingly always involve oral contact with the female genitalia, these terms are both encompassed within the definition of oral contact.

Thus, we conclude that within the first alternative means of committing aggravated criminal sodomy under K.S.A. 21-3501(2)—oral contact—there are various factual circumstances that prove the crime—*i.e.*, oral contact with oral penetration of the female genitalia or oral contact with the male genitalia. But these factual circumstances do not present alternative means of committing aggravated criminal sodomy, and we conclude the State presented sufficient evidence of the crime by proving that Britt forced A.C. to engage in oral contact with his genitalia.

*Aggravated Indecent Liberties*

Britt also challenges his conviction of aggravated indecent liberties claiming the jury instructions presented alternative means as to this crime and the State failed to present sufficient evidence of each means. The crime of aggravated indecent liberties is set out at K.S.A. 2010 Supp. 21-3504(a)(3)(A) and defined as: "Any lewd fondling or touching of the person of either the child or the offender, done or submitted to with the intent to arouse or to satisfy the sexual desires of either the child or the offender, or both." The portion of the jury instruction at issue here instructed the jury that to establish the charge of aggravated indecent liberties, it must find that "the defendant fondled or touched the person of A.C. in a

lewd manner, with intent to arouse or to satisfy the sexual desires of either A.C. or the defendant, or both."

Britt argues K.S.A. 2010 Supp. 21-3504(a)(3)(A) requires the State to present evidence that he acted with the intent to arouse or satisfy both his sexual desires *and* A.C.'s sexual desires. He reasons that because the State presented no evidence that he acted with the intent to arouse or satisfy A.C.'s sexual desires, the State necessarily failed to present sufficient evidence of each of the alternative means upon which the district court instructed the jury.

But *Brown* rejected this argument, and held that the phrase "either the child or the offender, or both" under K.S.A. 21-3504(a)(3)(A) does not state a material element of the crime but merely describes a secondary matter, the potential yet incidental objects of the offender's required intent. 295 Kan. at 201. Thus, the phrase outlines options within a means, and describes factual circumstances that may prove the distinct, material mental state element of the crime.

Because the phrase "either the child, the offender, . . . or both" in K.S.A. 21-3504(a)(3)(A) does not state material elements of the crime, but merely outlines options within a means, the jury instruction reiterating these options did not include alternative means of committing the charge of aggravated indecent liberties.

*Rape*

Britt also challenges his rape conviction, arguing the definition of this crime contains alternative means of committing the crime and the State failed to present sufficient evidence of those means.

"Sexual intercourse" as an element of the crime of rape is defined by K.S.A. 21-3501(1) as "any penetration of the female sex organ by a finger, the male sex organ or any object." In its instruction on the crime of rape, the jury was given this same definition of the term "sexual intercourse."

Britt argues K.S.A. 21-3501(1) creates three alternative means of penetrating the female sex organ: (1) by a finger; (2) by the male sex organ; and (3) by any object. Britt acknowledges that the State presented at least some evidence to support the claim that he penetrated A.C.'s vagina with his penis. However, Britt claims the State

failed to present evidence that he penetrated A.C.'s female sex organ with an object.

We address this challenge as we did Britt's first two alternative means challenges, by examining the language of the relevant statute, K.S.A. 21-3501(1), and determining whether alternatives within the statute define alternative means or "an option within a means." Again, we exercise de novo review over this question of law. *Brown*, 295 Kan. at 193-94.

The *actus reus* of the sexual intercourse reference in the rape statute is "penetration." The alternative methods of penetrating the female sex organ set forth in the statute—by a finger, the male sex organ, or an object—merely describe "the factual circumstances in which a material element may be proven," *i.e.*, the different ways in which penetration may occur. *Brown*, 295 Kan. at 196-97. Thus, these are not alternative means, but options within a means and the inclusion of this language in the jury instructions does not make this an alternative means case triggering concerns of jury unanimity. As such, Britt is not entitled to reversal of his rape conviction. See *State v. Burns*, 295 Kan. 951, 287 P.3d 261 (2012) (rejecting a similar argument regarding the anal penetration required under K.S.A. 21-3501[2] for aggravated criminal sodomy being perpetrated by [1] a body part or [2] an object).

## PROSECUTORIAL MISCONDUCT

Britt next alleges three instances of prosecutorial misconduct. We apply the well known two-step test to these claims. First, we consider whether the prosecutor's comments were outside the wide latitude allowed in discussing the evidence. If so, we next determine whether those comments prejudiced the jury against the defendant and denied the defendant a fair trial. This second step requires determining whether: (1) the misconduct was gross and flagrant; (2) the misconduct showed ill will on the prosecutor's part; and (3) the evidence was of such a direct and overwhelming nature that the misconduct would likely have had little weight in the minds of jurors. See *State v. Inkelaar*, 293 Kan. 414, 427, 264 P.3d 81 (2011). The third factor of the second step of the prosecutorial

misconduct test may not override the first two factors unless the State proves beyond a reasonable doubt that the error complained of did not affect the outcome of the trial in light of the entire record. *State v. Naputi*, 293 Kan. 55, 58, 260 P.3d 86 (2011).

*First Instance*

First, Britt contends that in closing argument, the prosecutor improperly requested the jury characterize A.C.'s testimony:

"I am asking you to assess the credibility of a nine-year-old girl, now 11, and its just that simple. It's this simple. She's either telling you the truth, in which case she's a victim of a horrible crime and he's guilty, or she's a lying, manipulative, conniving, creative, vindictive, evil child, who's accused this man right here of the most heinous of crimes, and he's innocent. It's one of the two. There are no shades of gray on this, folks. There is no middle ground.

"And once you decide those things about [A.C.], either she experienced these things and she's is a victim, or she's the most evil manipulating person you have ever seen. Because, again, there is no middle ground."

Britt argues the prosecutor made a misstatement of logic by advising the jury that in considering A.C.'s credibility, they must find one of two extreme alternatives: (1) either A.C. was telling the truth because she was "a victim of a horrible crime," or (2) A.C. was "a lying, manipulative, conniving, creative, vindictive, evil child."

Contrary to the prosecutor's argument, the jury was not presented with only two extreme options in considering A.C.'s credibility. Instead, as Britt points out in his brief on appeal, the jury was presented with several "shades of gray," in assessing A.C.'s credibility:

"Perhaps, as defense counsel suggested, someone had 'manipulated' A.C. into making the allegations. Perhaps A.C. believed she was telling the truth, when in reality, none of the abuse had occurred. Perhaps A.C. had made the initial allegation that Mr. Britt had '*tried* to kiss her,' and that he '*was trying* to rub on her genitals,' and, after realizing how much attention she received for saying those things had occurred, she began to embellish upon her story. She may have then become afraid that, if she admitted to those embellishments, her mother (and others) would be angry at her. Perhaps some of A.C.'s claims were true, meaning Mr. Britt was guilty of some of the crimes the State alleged he had committed, but some of A.C.'s claims were false, making Mr. Britt not guilty of some of the crimes the State alleged he had committed. Any of these scenarios would consti-

tute the type of 'grey area' or 'middle ground' the prosecutor, during his closing argument, claimed did not exist."

We agree with Britt that the prosecutor clearly misstated the jury's options in considering the credibility of the victim, and the prosecutor intended these misstatements to improperly influence jurors to believe they had no choice other than to find the victim entirely credible and convict Britt of all charges.

But while we find these statements outside the wide latitude given to prosecutors, it was not reversible error. First, there was no showing of ill will by the prosecutor. See *State v. Miller*, 284 Kan. 682, 719, 163 P.3d 267 (2007) (" 'In past cases, we have noted a prosecutor's indifference to a court's rulings, mocking of a defendant, or repeated acts of misconduct are evidence of ill will and the lack of such conduct shows that there was no ill will. [Citations omitted.]' "); *State v. Washington*, 275 Kan. 644, 672, 68 P.3d 134 (2003) (stating that a few comments in lengthy transcript do not show ill will).

When determining whether a prosecutor's conduct is gross and flagrant, we consider whether the prosecutor " 'repeated or emphasized the misconduct.' " *State v. Simmons*, 292 Kan. 406, 418, 254 P.3d 97 (2011). Here, while the prosecutor repeated the offending misstatement twice in his closing argument, the statements were not emphasized and repeated throughout the entire argument. So while we disapprove of the comments, we find that under the circumstances of this case, the prosecutor's statements were not gross and flagrant.

Because we have found an absence of prejudice under the second prong of the test for prosecutorial misconduct, we conclude the prosecutor's improper comments do not require reversal.

*Second Instance*

Next, Britt argues that the prosecutor erred when he commented on the credibility of Dr. Logan, Britt's expert witness. The prosecutor stated, "Dr. Logan is a paid defense witness. Period. And all he told you were things that you are definitely smart enough to look at the tape and see."

Here, because Dr. Logan testified that he was a paid witness, the prosecutor stated a fact in evidence. In that sense, this case is distinguishable from *State v. Sprung*, 294 Kan. 300, 312, 277 P.3d 1100 (2012), where the prosecutor insinuated that paid witnesses lie in order "to get [the defendant] off." Moreover, exposing a witness' bias or motive for testifying is a proper subject for cross-examination. See *State v. Jones*, 273 Kan. 756, 783, 47 P.3d 783, *cert. denied* 537 U.S. 980 (2002). Thus, by extension, a prosecutor is free to argue a witness' bias or motive to the jury if the evidence has established the facts.

For these reasons, we conclude the prosecutor's comments regarding Britt's expert witness were not outside the wide latitude allowed the prosecutor, and we need not reach the prejudice prong of the test.

*Third Instance*

The prosecutor concluded his closing argument by stating: "Folks, I am confident when you go back there, you put your heads together, you are going to apply some common sense, and you are going to do the right thing, here, find him guilty." Britt argues that with this remark, the prosecutor inappropriately injected his own personal opinion of the defendant's guilt. Further, Britt contends that because the prosecutor represents the State of Kansas, the prosecutor misled the jury into believing that the prosecutor's opinion about the justness of his cause was validated by the State of Kansas. See *State v. Morris*, 40 Kan. App. 2d 769, 787-88, 196 P.3d 422 (2008). The State contends the prosecutor's remark was an appropriate request for justice.

In determining whether the prosecutor's statement was outside the wide latitude given to prosecutors, we note that we have been critical of similar comments in which the prosecutor requested justice on behalf of either the victim or the community. For instance, in *State v. Ruff*, 252 Kan. 625, 636, 847 P.2d 1258 (1993), the prosecutor improperly told the jury that it had a duty to send a message to the community and convict the defendant. And in *State v. Martinez*, 290 Kan. 992, 1013-14, 236 P.3d 481 (2010), the prosecutor improperly asked the jury to return a guilty verdict in order

to tell a child rape victim that " 'she did the right thing' " by reporting the crime.

In contrast, the prosecutor's statement to the jury "to do the right thing" in this case is more aptly characterized as a general appeal for justice that was not explicitly tied to the community or the victim. See, *e.g. State v. Nguyen*, 285 Kan. 418, 425, 172 P.3d 1165 (2007) (noting it is permissible for prosecutor to argue for justice in general, or "justice for the citizenry of the State of Kansas"). Accordingly, we find this statement by the prosecutor was not improper.

### CONSTITUTIONALITY OF SENTENCE

Britt contends his sentence violates the prohibition against infliction of cruel or unusual punishment found in § 9 of the Kansas Constitution Bill of Rights. Recently, we concluded that the hard 25 life sentence under Jessica's Law, K.S.A. 21-4643(a)(1)(C), withstands § 9 constitutional scrutiny. See *State v. Woodard*, 294 Kan. 717, 724-25, 280 P.3d 203 (2012). In his Rule 6.09(b) letter, Britt asks this court to revisit that holding.

*Standard of Review*

In *Woodard*, 294 Kan. at 720, we reiterated the standard of review for § 9 constitutional challenges.

"In determining whether a sentence is cruel or unusual, a district court must make both legal and factual inquiries. See, *e.g.*, *State v. Ortega-Cadelan*, 287 Kan. 157, 160-61, 194 P.3d 1195 (2008). These inquiries invoke a bifurcated standard of review: without reweighing the evidence, the appellate court reviews the factual underpinnings of the district court's findings under a substantial competent evidence standard, and the district court's ultimate legal conclusion drawn from those facts is reviewed de novo. *State v. Gant*, 288 Kan. 76, 80, 201 P.3d 673 (2009); *State v. Woolverton*, 284 Kan. 59, 70, 159 P.3d 985 (2007).

"A statute is presumed constitutional and all doubts must be resolved in favor of its validity. If there is any reasonable way to construe a statute as constitutionally valid, the court has the authority and the duty to do so. *State v. Laturner*, 289 Kan. 727, 735, 218 P.3d 23 (2009); see also *State ex rel. Six v. Kansas Lottery*, 286 Kan. 557, 562, 186 P.3d 183 (2008) ('It is not the duty of this court to criticize the legislature or to substitute its view on economic or social policy; it is the duty of this court to safeguard the constitution.')." *State v. Woodard*, 294 Kan. at 720.

*The* Freeman *Test*

In considering constitutional challenges under § 9 of the Kansas Constitution Bill of Rights, we apply the 3-part *Freeman* test:

"(1) The nature of the offense and the character of the offender should be examined with particular regard to the degree of danger present to society; relevant to this inquiry are the facts of the crime, the violent or nonviolent nature of the offense, the extent of culpability for the injury resulting, and the penological purposes of the prescribed punishment;

"(2) A comparison of the punishment with punishments imposed in this jurisdiction for more serious offenses, and if among them are found more serious crimes punished less severely than the offense in question the challenged penalty is to that extent suspect; and

"(3) A comparison of the penalty with punishments in other jurisdictions for the same offense." *State v. Freeman*, 223 Kan. 362, 367, 574 P.2d 950 (1978).

Under this test, no single factor controls. " 'Ultimately, one consideration may weigh so heavy that it directs the final conclusion,' but 'consideration should be given to each prong of the test.' " *Woodard*, 294 Kan. at 723 (quoting *State v. Ortega-Cadelan*, 287 Kan. 157, 161, 194 P.3d 1195 [2008]).

At sentencing, Britt filed a motion for downward departure and requested that the district court find K.S.A. 21-4643 unconstitutional under § 9 of the Kansas Constitution. Although the district court considered the nature of the offense and compared Kansas' Jessica's Law scheme with similar schemes in other states, the district court denied the motion without expressly considering the second *Freeman* factor—comparison of Jessica's Law sentences with sentences for more serious offenses.

The district court's failure to expressly consider the second prong implicates the district court's legal conclusion but does not raise a preservation issue. See *State v. Gonzalez*, 290 Kan. 747, 756, 234 P.3d 1 (2010) (district court abuses its discretion when it fails to follow the law); *State v. Ortega-Cadelan*, 287 Kan. at 161 (district court should give "consideration [ ] to each prong of the test"); Here, Britt presented his argument and the district court denied the motion, loosely following the *Freeman* factors. Thus, Britt preserved the issue, and we will consider his argument under *Freeman*.

The first *Freeman* factor requires this court to consider the nature of the offense and the character of the offender. Here, Britt had a prior person felony sex offense from Tennessee. While he apparently submitted a psychological report that indicated he was not a pedophile, Britt's own criminal history indicated that he is a risk to reoffend. Like Woodard, Britt "enjoyed a position of trust as the victim's stepfather." *Woodard*, 294 Kan. at 721. And also like Woodard, Britt's sexual abuse of his stepdaughter did not stop until law enforcement intervened, *i.e.*, when he was arrested for domestic abuse. While the length of Britt's abuse of A.C. is unknown, the State proved multiple, reoccurring instances of abuse. Under these circumstances, we conclude that as in *Woodard*, Britt's argument under the first *Freeman* factor fails.

Next, we compare the Jessica's Law sentencing scheme with sentences for more serious Kansas offenses. In *Woodard*, we held that at least one part of the Jessica's Law sentencing scheme, the hard 25 life sentence under K.S.A. 21-4643(a)(1)(C), survived § 9 scrutiny under this factor. 294 Kan. at 724-26. Here, however, Britt was sentenced under K.S.A. 21-4643(a)(2)(B). In his 6.09(b) letter, Britt argues this distinction gives this court a basis to distinguish *Woodard*. We disagree. K.S.A. 21-4643(a)(2)(B) provides:

"The provision of paragraph (1) requiring a mandatory minimum term of imprisonment of not less than 25 years shall not apply if the court finds:

. . . .

(B) the defendant, because of the defendant's criminal history classification, is subject to presumptive imprisonment pursuant to the sentencing guidelines grid for nondrug crimes and the sentencing range exceeds 300 months. In such case, the defendant is required to serve a mandatory minimum term equal to the sentence established pursuant to the sentencing range."

This distinction seems largely irrelevant. In *Woodard*, we were less concerned with the mandatory 25-year minimum and more focused on the "off-grid" life sentence. *Woodard*, 294 Kan. at 724-26 (citing cases upholding "life sentences"). Due to Britt's criminal history score of B, Britt received a mandatory minimum sentence of 618 months' imprisonment. If he had been convicted of "on-grid" rape, he would have received a sentence somewhere between 554-618 months and would have been eligible for good time credit.

See K.S.A. 21-4704(a); K.S.A. 21-4722 (good time credit calculation).

Britt does not argue that a grid sentence of 618 months would be cruel or unusual. *Cf. State v. Nunn,* 247 Kan. 576, Syl. ¶ 4, 802 P.2d 547 (1990) (holding that sentence of a minimum of 80 years to a maximum of life for four counts of criminal indecent liberties with a child and three counts of aggravated criminal sodomy was not an abuse of discretion). Instead, he contends his sentence was higher or identical to the sentence some defendants received for convictions of murder. Specifically, Britt argues that had he been convicted of premeditated murder, he would face only a hard 25 under K.S.A. 22-3717(b).

However, as the State points out, under K.S.A. 21-4635 and 21-4638, Britt could also face an identical sentence—a mandatory minimum sentence of 618 months' imprisonment. See K.S.A. 21-4638 (a defendant sentenced under the hard 50 scheme receives a mandatory minimum term equal to the sentence established pursuant to the sentencing range if the grid sentence exceeds 600 months).

In any event, *Woodard* ultimately rejected this line of reasoning, describing its several flaws:

"This argument suffers from several flaws. In the first place, it assumes that murderers necessarily receive more lenient sentences in Kansas than violators of Jessica's Law. This is not the case. In fact, the Kansas Criminal Code sets out a list of transgressions that constitute capital murder, which is an off-grid offense. K.S.A. 21-3439. Capital murder is subject to punishment by death. K.S.A. 21-4624. The penalty for homicide in Kansas may thus be much more severe than the penalties under Jessica's Law. See K.S.A. 21-4638; K.S.A. 21-4643. The fact that the penalty for certain categories of homicide may be less severe than the penalties for other, nonhomicide crimes does not automatically render the penalties for the nonhomicide crimes unconstitutional. There is no strict linear order of criminal activity that ranks all homicides as the most serious crimes and all nonhomicide crimes as less serious, with the corresponding penalties necessarily ranking in diminishing durations of imprisonment.

"Furthermore, as the State points out, Jessica's Law is not the only Kansas statute that provides for more severe penalties for nonhomicide crimes than for certain categories of homicide. Compare, *e.g.*, rape, K.S.A. 21-3502, and aggravated kidnapping, K.S.A. 21-3420, which are severity level 1 offenses, with reckless

second-degree murder, K.S.A. 21-3402(b), which is a severity level 2 offense."
*Woodard*, 294 Kan. at 723-24.

For similar reasons, we conclude that the penalty under K.S.A. 21-4643(a)(2)(B) is not disproportionately harsh when compared with the punishments imposed for other offenses in Kansas.

Finally, for the same reasons we delineated in *Woodard*, we find that the penalty imposed under K.S.A. 21-4643(a)(2)(B) is not disproportionate to sentences imposed for similar crimes in other states which have withstood allegations of cruel and unusual punishment. See *Woodard*, 294 Kan. at 724.

For these reasons, we reject Britt's claim that his Jessica's Law sentence violates § 9 of the Kansas Constitution Bill of Rights.

LIFETIME POSTRELEASE SUPERVISION

Both parties agree that the district court erred in imposing lifetime postrelease supervision. See K.S.A. 22-3717(b)(5) and *State v. Cash*, 293 Kan. 326, 330-31, 263 P.3d 786 (2011) (holding that a defendant sentenced under Jessica's Law was improperly sentenced to lifetime postrelease supervision).

We affirm Britt's convictions but vacate the imposition of lifetime postrelease supervision.