NOT DESIGNATED FOR PUBLICATION

No. 120,578

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

THOMAS CANAL DAVIS,
*Appellant*.

MEMORANDUM OPINION

Appeal from Shawnee District Court; DAVID DEBENHAM, judge. Opinion filed July 24, 2020. Affirmed in part, reversed in part, and remanded with directions.

*Patrick H. Dunn*, of Kansas Appellate Defender Office, for appellant.

*Jodi Litfin*, assistant solicitor general, and *Derek Schmidt*, attorney general, for appellee.

Before ARNOLD-BURGER, C.J., WARNER, J., and LAHEY, S.J.

PER CURIAM: Thomas Davis appeals his convictions for aggravated criminal sodomy and attempted aggravated criminal sodomy. After carefully reviewing the record and Davis' multiple claims of error, we agree that there was insufficient evidence for the attempted aggravated criminal sodomy offense, as the State failed to prove both alternative means it had charged for that crime. We reverse that conviction and remand the case for a new trial on the one means supported by the evidence. We affirm Davis' conviction for aggravated criminal sodomy.

1

FACTUAL AND PROCEDURAL BACKGROUND

In 2017, D.A., who was 20 years old, lived with Davis and his wife. When D.A. was a baby, she suffered epileptic seizures that caused her to suffer developmental delays and affected her ability to communicate. Davis and D.A. were home alone together frequently while other family members were out of the house and working.

At some point during the evening of June 7, 2017, D.A. approached her grandmother, who also lived at the home, and stated that Davis had tried to do something sexual with her that morning. D.A.'s grandmother recalled D.A. telling her that Davis woke her up, made her take a shower, bent her over the bed, and commented that "he couldn't do nothing because she was on her monthly." D.A. also told her grandmother that Davis had been orally sodomizing her and that she was afraid to say anything because she did not want to get in trouble. The next morning, D.A. told her mother (Davis' wife) that Davis had been making her "do some things that she did not want to do." D.A. did not tell her mother any specifics about what Davis had done to her. D.A.'s mother promptly kicked Davis out of the house, called the police, and took D.A. to the hospital.

Detective Grant Mink of the Topeka Police Department met D.A. and her mother at the hospital to investigate the allegations against Davis. Due to D.A.'s difficulty communicating, Mink set up a forensic interview at Life House Child Advocacy Center. Later that day, D.A. met with a social worker trained in conducting forensic interviews with children who have been abused. While D.A. had some difficulty explaining what had happened and remembering certain details, she relayed that Davis had been anally and orally sodomizing her on a nearly daily basis for the past year. D.A. described white "spills" coming out of Davis' penis and going on to the floor in her bedroom and further stated that Davis had abused her in other rooms in the house when no one else was home. D.A. also referred to Davis touching himself "to get that juice stuff out."

2

Although D.A. explained that Davis had been forcing her to do sexual things frequently over the past year, she specifically talked about Davis' actions on the past two days, June 6 and 7:

- D.A. told the interviewer that Davis had anally sodomized her on June 6, and white "spills" had come out of his penis and fell onto the floor of her bedroom. She stated that Davis did not clean up the spill and that it was still on the floor in her room.

- D.A. told the interviewer that on June 7, Davis bent her over the bed and pulled her pants down. She believed he was going to put his penis in her bottom, but he did not because she was menstruating. She stated nothing came out of his penis that day.

After D.A.'s forensic interview, a SANE/SART-trained nurse performed a sexual-assault examination. The nurse noted that there were no injuries to D.A.'s anal or vaginal areas, but she also concluded the absence of injury did not conclusively indicate anal intercourse did not occur. The nurse also took a swab of D.A.'s anus and sent it to the Kansas Bureau of Investigation for analysis. The swab did not contain any semen or DNA.

After the interview and examination, Detective Mink accompanied D.A. and her mother back to their house. D.A. showed him the stain on the floor of her bedroom where she described Davis had ejaculated. Detective Mink took photographs and a sample of the stain to send to the KBI for analysis. He stated it "appeared that there was some kind of fluid or dried fluid . . . looked like it had been sticky at some point, but it had dried on the floor."

3

Two months later, Detective Mink interviewed Davis at the police station. Davis voluntarily participated in the interview and repeatedly denied the accusations against him. He speculated that D.A.'s mother and grandmother had manufactured the story and told D.A. what to say because they wanted him out of the house. Detective Mink told Davis about the sexual-assault examination and the sample taken from D.A.'s bedroom floor and asked Davis if he would consent to giving a DNA sample; Davis agreed to do so.

Ultimately, the sample taken from the bedroom floor was determined to be semen and was consistent with Davis' DNA profile. The sample also contained another source of DNA, but there was not enough present to determine if it was D.A.'s.

After receiving the KBI report, Detective Mink interviewed Davis a second time. Mink informed Davis that the sample taken from D.A.'s floor was semen and matched his DNA profile. Davis was incredulous and insisted that he had never touched or had sex with D.A. Detective Mink told Davis that D.A. had taken him straight to the spot in her room where his semen was located and asked why she would know that it was his semen. Davis responded that one day he was masturbating while watching his wife bathe and D.A. had come up the stairs, so he ran to the nearest room (which happened to be D.A.'s) and ejaculated on the floor. Davis explained that he never cleaned up his semen from D.A.'s room because he was high and forgot about it.

The State charged Davis with two counts of aggravated criminal sodomy, alleging one to have occurred on June 6, 2017, and the other on June 7, 2017. At Davis' trial, the court instructed the jury on each count. The only difference between the two instructions, other than date of the alleged offense, was that the instruction on count one specified that "Sodomy means: (1) anal penetration, however slight, of a female by any body part or object," whereas the instruction on count two stated that "Sodomy means: (1) oral contact

4

of the male genitalia; or (2) anal penetration, however slight, of a female by any body part or object."

The jury found Davis guilty of aggravated criminal sodomy on count one and attempted aggravated criminal sodomy (a lesser included offense) on count two. Davis was sentenced to a controlling 346-month prison sentence followed by a lifetime term of postrelease supervision.

Davis appeals. We include additional facts as they become relevant to our discussion.

DISCUSSION

1. *Davis' conviction of attempted aggravated criminal sodomy (count two) is not supported by sufficient evidence.*

In count two of its indictment, the State charged that Davis had engaged in aggravated criminal sodomy on June 7, 2017. At trial, the district court instructed the jury, at the State's suggestion, that sodomy was defined as "(1) oral contact of the male genitalia; or (2) anal penetration, however slight, of a female by any body part or object." This same definition of sodomy was included, again at the State's suggestion, in the court's instruction concerning the lesser included offense of attempted aggravated criminal sodomy.

The jury ultimately found Davis guilty of the attempted aggravated criminal sodomy. Davis contends this conviction must be reversed because the instruction provided alternative means of committing the offense—through attempted oral contact of Davis' penis or attempted anal penetration of D.A. Davis argues the State provided no evidence that he had engaged in, or attempted to engage in, oral sodomy with D.A. on June 7. We agree.

5

When a defendant challenges the sufficiency of the evidence in a criminal case, an appellate court reviews all the evidence at the jury's disposal in a light most favorable to the prosecution. *State v. Chandler*, 307 Kan. 657, 668, 414 P.3d 713 (2018). For the evidence to be sufficient, "there must be evidence supporting each element of a crime." *State v. Kettler*, 299 Kan. 448, 471, 325 P.3d 1075 (2014). We will not set aside a conviction for insufficient evidence if we "'[are] convinced a rational factfinder could have found the defendant guilty beyond a reasonable doubt.'" *Chandler*, 307 Kan. at 668. We do not reweigh evidence, resolve evidentiary conflicts, or make determinations on witness credibility. 307 Kan. at 668.

A jury must unanimously agree the defendant committed the charged crime before it can find a defendant guilty of that offense. See K.S.A. 22-3421; *State v. Brooks*, 298 Kan. 672, 677, 317 P.3d 54 (2014). This is straightforward when a crime can only be committed one way. Some crimes, however, can be committed in multiple ways—that is, there are alternative avenues of committing the crime. See *State v. Brown*, 295 Kan. 181, 192, 284 P.3d 977 (2012). When the State charges (or the court instructs on) elements of a crime in the alternative with multiple means of committing the crime, the State must present sufficient evidence to support a conviction for each of those means. See *Brooks*, 298 Kan. at 677. That way, the court and parties can be sure the jury reached a unanimous verdict.

At its core, alternative-means jurisprudence is rooted in the principle that the State must prove every element of its claim beyond a reasonable doubt. For this reason, an alternative-means error cannot be excused as harmless even if the State presented compelling evidence supporting one of the means to commit the offense. *State v. Wright*, 290 Kan. 194, 205, 224 P.3d 1159 (2010).

Our Kansas Supreme Court has held that the statutory definition of sodomy creates three alternative means of engaging in that conduct: "(1) oral contact with male or female genitalia; (2) anal penetration of a male or female; and (3) sexual acts between a person and an animal." *State v. Britt*, 295 Kan. 1018, 1024-25, 287 P.3d 905 (2012); see also *State v. Dern*, 303 Kan. 384, 396, 362 P.3d 566 (2015) (statutory definition of sodomy provides three "alternative means" of committing the crime). The State alleged the first two of those means applied here. And the court instructed the jury on both of those two alternative ways of committing the offense.

Having reviewed the trial record, we find there was ample evidence that Davis attempted to engage in anal sex with D.A. on June 7. According to D.A., Davis forced her to take a shower because she was menstruating and then bent her over her bed and removed her pants, though he did not anally penetrate her and instead ejaculated on her bedroom floor. But there was no evidence that Davis attempted to have D.A. engage in oral contact with his genitalia on June 7. Because the State chose to argue oral and anal sodomy as alternative means of committing the offense on that day, it was required to present evidence of both of those means. It did not do so.

The State concedes that it did not present specific evidence of oral sodomy occurring on June 7. But it maintains that D.A.'s extensive testimony about Davis sodomizing her—both orally and anally—on an almost daily basis over the prior year sufficed to support the conviction. It is true that the Kansas Supreme Court has found on occasion that an error in the date in a charging document or instruction is not fatal to a conviction. See *State v. Stafford*, 296 Kan. 25, 55, 290 P.3d 562 (2012) (error in instructing that a rape occurred on one of two dates, when a reasonable person would understand the language to mean it occurred between the two dates, did not require reversal of a conviction); see also *State v. Colston*, 290 Kan. 952, 963, 235 P.3d 1234 (2010) ("on or about" language was imprecise in referring to a date), *overruled on other*

7

*grounds by State v. Dunn*, 304 Kan. 773, 375 P.3d 332 (2016). But that rule does not apply here.

Instead, it is evident from the charging documents and the instructions that the State intended to charge Davis with two instances of aggravated criminal sodomy, one on June 6 and one on June 7. These dates were not meaningless. Otherwise, taken to its logical conclusion, the State's argument could result in Davis being charged twice for the same conduct—with both charges potentially encompassing conduct occurring on both days. Neither party asserts this to be the case.

"When there is insufficient evidence . . . to support the defendant's conviction of each alternative means of committing a crime, the proper remedy is to reverse the defendant's conviction and remand for a new trial only on the alternative means supported by sufficient evidence in the first trial." *State v. Shay*, 56 Kan. App. 2d 721, Syl. ¶ 3, 437 P.3d 78, *rev. denied* 310 Kan. 1070 (2019). We thus reverse Davis' conviction for attempted aggravated criminal sodomy and remand the case for a new trial on the charge that Davis attempted to engage in anal sodomy with D.A. on June 7, 2017.

2. *The State did not commit prosecutorial error during closing argument.*

Davis next contends the State committed prosecutorial error in closing argument by commenting on the credibility of witnesses, mischaracterizing the evidence, and inflaming the passions of the jury.

"Appellate courts employ a two-step analysis when evaluating claims of reversible prosecutorial error. These two steps are simply described as error and prejudice." *Chandler*, 307 Kan. 657, Syl. ¶ 5. Under this analysis, we first must decide whether the challenged actions fall outside of the wide latitude afforded to prosecutors to conduct the State's case. If a prosecutor engaged in impermissible conduct, we consider whether that

8

error is reversible. 307 Kan. 657, Syl. ¶ 6. That is, we must determine whether the prosecutor's actions prejudiced the defendant's right to a fair trial under the constitutional harmless-error standard in *Chapman v. California*, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967). The State must prove there was no reasonable possibility that the error contributed to the trial's outcome. *Chandler*, 307 Kan. 657, Syl. ¶ 7.

Questions of credibility are matters for the jury to evaluate based on the jurors' observations and collective experience. For this reason, prosecutors are not generally permitted to offer their personal opinions about the credibility of witnesses. *State v. Sean*, 306 Kan. 963, 979, 399 P.3d 168 (2017); *State v. Hart*, 297 Kan. 494, 505, 301 P.3d 1279 (2013). But prosecutors may argue the evidence—including reasonable inferences that may be drawn about witness credibility from the evidence presented. *Sean*, 306 Kan. at 979; see *State v. Duong*, 292 Kan. 824, 831-32, 257 P.3d 309 (2011) (prosecutor's comments about witnesses' credibility not improper because they were reasonable inferences based on the evidence at trial and prosecutor directed jury to that evidence); *State v. Davis*, 275 Kan. 107, 122-23, 61 P.3d 701 (2003) (prosecutor argued reasonable inferences based on evidence in stating witness should be believed and that witness was more likely to tell truth in first police interview than second).

Davis points out a number of instances in the State's closing argument when the prosecutor did just that—argued reasonable inferences from the evidence. For example, the State argued that, in light of the facts presented at trial, the "most reasonable interpretation" would be that Davis sodomized D.A. even though he denied it in his interviews. The State also pointed out potential holes in Davis' account for how his semen ended up on D.A.'s bedroom floor or how he believed D.A.'s mother and grandmother convinced D.A. to fabricate her accusations, particularly when comparing that story to D.A.'s consistent explanation of the events.

The prosecutor certainly used the word "credible" at times in his closing argument. But reading that argument as a whole, we find his argument was based on the evidence and reasonable inferences drawn therefrom. The prosecutor consistently framed his argument in terms of the evidence presented, stating that he merely wanted to contrast the evidence that had been presented by both sides. Not only did the prosecutor emphasize the evidence presented in his argument, he also clarified that his opinion was irrelevant, stating, "[W]hat I'm going to do right now is discuss [the] evidence with you and ask you to return a verdict consistent with that evidence. . . . Now, I cannot give you my opinion about the evidence. . . . [O]ur opinion does not matter."

A prosecutor is permitted to argue that the evidence presented and any inconsistencies in a defendant's statements tend to reflect poorly on his or her credibility. *State v. Brown*, 300 Kan. 542, 560, 331 P.3d 781 (2014). And our Kansas Supreme Court has stated that in situations where credibility determinations are central, the "parties may advocate for reasonable inferences based on evidence suggesting that certain testimony is not believable," so long as the ultimate conclusion about witness credibility is left to the jury. *Hart*, 297 Kan. at 505-06.

Because the prosecutor in this case did not offer his personal opinion on the credibility of witnesses, presented reasonable inferences based on the evidence, and stressed that the jury was required to come to its own conclusions about witness credibility, his argument did not fall outside the wide latitude he was afforded. Accordingly, we find no prosecutorial error occurred.

We note, however, that even if some aspect of the prosecutor's comments treaded too closely to the jury's credibility assessments, the evidence that Davis committed aggravated criminal sodomy on June 6—the conviction remaining following our reversal of count two—was overwhelming. The evidence against him for that offense, including

10

among other things D.A.'s statement and Davis' semen found on D.A.'s floor, all indicated he anally sodomized D.A. on that day.

And the district court instructed the jury before closing arguments that it must disregard statements made by counsel that were not supported by evidence introduced at trial: "Statements, arguments, and remarks of counsel are intended to help you in understanding the evidence and in applying the law, but they are not evidence. If any statements are made that are not supported by evidence, they should be disregarded." When a district court instructs a jury to disregard any statements by counsel not supported by evidence, this court presumes the jury followed that instruction. *State v. Barber*, 302 Kan. 367, 383, 353 P.3d 1108 (2015). And the prosecutor reiterated this same sentiment throughout his argument.

We conclude the State did not commit prosecutorial error during closing argument. And even if there were an error, the prosecutor's statements, when viewed in light of the record as a whole and the evidence against Davis, did not alter the jury's verdict.

3. *The district court did not err in admitting the recorded forensic interview of D.A. and the testimony of the forensic interviewer describing that discussion.*

D.A. was the State's first witness at trial and described her experiences with Davis. A few witnesses later, the State called the social worker who conducted the forensic interview with D.A. on June 8, 2017, the day D.A. was taken to the hospital, to provide foundation for introducing the video recording of the interview. The prosecutor asked the social worker if D.A. had disclosed any sexual abuse and, "Generally speaking, what did she say?" Davis objected to this line of questioning and the introduction of the video as cumulative evidence that was "redundant" since D.A. "already testified [about] what she said in the interview." The court overruled Davis' objection.

11

A district court is granted the discretion to admit cumulative evidence; its decision will only be reversed for an abuse of discretion. *State v. Dupree*, 304 Kan. 43, 65, 371 P.3d 862 (2016); *State v. Rodriguez*, 295 Kan. 1146, 1156, 289 P.3d 85 (2012); *State v. Rice*, 261 Kan. 567, 585, 932 P.2d 981 (1997). A court abuses its discretion if no reasonable person would take the view it adopted or if its decision is based on an error of law or fact. *State v. Boysaw*, 309 Kan. 526, 539, 439 P.3d 909 (2019).

Unless excluded by law, all relevant evidence is admissible. K.S.A. 60-407(f). A claim that evidence is "cumulative" does not challenge its relevance, but rather asserts that the evidence is repetitive of other evidence already admitted and unnecessary to the point of becoming unduly prejudicial. *State v. Hickles*, 261 Kan. 74, 88, 929 P.2d 141 (1996). These determinations—similar to the number of witnesses or amount of evidence presented—are matters traditionally left to the sound judgment of the trial court.

Davis focuses his argument on appeal on a challenge to this court's decision in *State v. Kackley*, 32 Kan. App. 2d 927, 92 P.3d 1128, *rev. denied* 278 Kan. 849 (2004), but that argument is misdirected. *Kackley* held that prior consistent statements of rape victims may be introduced to corroborate the victims' statements. 32 Kan. App. 2d at 935. Davis argues *Kackley* was wrongly decided and misapplied Kansas Supreme Court caselaw.

Davis' argument is flawed in several respects. But most notably, the rule in *Kackley* was not the reason the district court admitted the video or the social worker's testimony. And Davis provides no argument or explanation, apart from his disagreement with *Kackley* and the Kansas Supreme Court caselaw on which it relied, as to why the ruling in that case has any bearing on the court's admission of the challenged evidence here or why the admission of that evidence was an abuse of the court's discretion.

12

We find it was not. Davis had consistently challenged the veracity of D.A.'s story. He presented his case as a battle of his and D.A.'s credibility. And Kansas courts have often allowed witnesses to give cumulative testimony on the same subject. See *State v. Torres*, 280 Kan. 309, 333, 121 P.3d 429 (2005); *Rice*, 261 Kan. at 585; *State v. Johnson*, 231 Kan. 151, 156-57, 643 P.2d 146 (1982). Particularly here, where Davis argued D.A. was being persuaded by her mother and grandmother to provide a false statement, Davis has not shown the district court abused its discretion in admitting the video of the forensic interview or in allowing the social worker to testify.

4. *The DNA analyst did not provide improper expert testimony.*

At trial, a DNA analyst testified that the semen found on D.A.'s bedroom floor was consistent with Davis' DNA profile. During cross-examination, Davis' attorney asked the analyst whether any seminal fluid was found on the rectal swab from D.A.'s SANE/SART examination. The analyst indicated there was not. When the prosecutor examined the analyst on redirect examination, the following exchange occurred:

"Q. . . . Does the lack of detection of sperm or semen in the rectal swab indicate to you that [D.A.] was not sodomized?

"A. No, it's possible that sexual contact or penetration did occur and no seminal fluid would be identified.

"Q. Can you explain to the jury why that might be?

"A. There are many reasons. It could include the male had some kind of disease that lowered their sperm count, they were vasectomized, or they had worn a condom at the time of penetration.

"Q. Is one possibility that ejaculation did not occur in or on the body?

"A. Yes, that is possible as well.

"Q. So if a person ejaculated on the floor there might not be DNA around her anus?

"A. That is correct."

13

The defense attorney then broached the subject again on recross-examination , asking the analyst, "Your findings of the rectal swab don't indicate there was sodomy either?" The analyst responded, "That is correct."

On appeal, Davis argues that this testimony—about what the absence of semen in a rectal sample might demonstrate—is beyond the common experience of the jury. Davis argues that the analyst was not qualified to provide expert testimony beyond analyzing the DNA report.

As a preliminary matter, we question whether the argument Davis raises was properly preserved. Davis objected to the State's initial question on redirect-examination for lack of "foundation"—a different argument from what he now makes on appeal—and did not otherwise object to the analyst's testimony. K.S.A. 60-404 requires a party to timely object to the admission of evidence to seek reversal of a judgment based on its erroneous admission. *State v. Breeden*, 297 Kan. 567, 581, 304 P.3d 660 (2013). Under this statute, a verdict or judgment will not be reversed "by reason of the erroneous admission of evidence unless there appears of record objection to the evidence timely interposed and so stated as to make clear the specific ground of objection." K.S.A. 60-404; see also *State v. King*, 288 Kan. 333, 336, 204 P.3d 585 (2009) (compliance with K.S.A. 60-404 is required to preserve evidentiary issues for appellate review).

K.S.A. 60-404's requirement of a timely and specific objection allows a district court to act as the evidentiary gatekeeper at trial. Appellate courts have often noted the importance of a district court's gatekeeping role in cases involving the admission of expert testimony. See *Smart v. BNSF Ry. Co.*, 52 Kan. App. 2d 486, 496, 369 P.3d 966 (2016). We are not convinced that Davis' objection to the "foundation" of the analyst's

testimony apprised the court that Davis believed she was providing unvetted expert testimony or allowed the court to act as an evidentiary gatekeeper in this regard.

But even if Davis' evidentiary claim were properly before us, we would not find it persuasive. The analyst's answers to the prosecutor's questions on redirect-examination—and the answers she provided during recross-examination—were not expert opinions. Instead, her answers essentially indicated that there might be lots of reasons why a DNA sample would not include any semen. For example, if a person wore a condom or did not ejaculate in the tested location, the sample would not show any seminal fluid. This testimony was not an expert opinion, but rather an answer based on logic and human experience. Accord K.S.A. 2019 Supp. 60-456(a)(1) (describing non-expert opinion or inference testimony). Davis has not apprised us of error in the analyst's responses.

5. *Davis has not shown cumulative error.*

In his final claim on appeal, Davis argues cumulative error deprived him of a fair trial. This court analyzes a claim of cumulative error under a de novo standard. *State v. Ross*, 310 Kan. 216, 227, 445 P.3d 726 (2019). If there is no error or only a single error found, there is no error to accumulate and therefore no basis to reverse a conviction. See *State v. Gonzalez*, 307 Kan. 575, 598, 412 P.3d 968 (2018); *State v. Haberlein*, 296 Kan. 195, 212, 290 P.3d 640 (2012).

Although we conclude there was insufficient evidence to convict Davis for the alternative means charged for attempted aggravated criminal sodomy, the remedy for that error is to reverse Davis' conviction for that offense and remand for a new trial on the means supported by the evidence in his original trial. We do so. But aside from the evidentiary deficiency based on the manner this offense was charged, we have found no other errors in Davis' trial. Davis' allegation of cumulative error therefore fails.

We affirm Davis' conviction for aggravated criminal sodomy for his conduct on June 6, 2017. We reverse his conviction for attempted aggravated criminal sodomy and remand for a new trial on that charge, limited solely to the question as to whether Davis attempted to engage in anal sodomy with D.A. on June 7, 2017.

Affirmed in part, reversed in part, and remanded with directions.