NOT DESIGNATED FOR PUBLICATION

No. 116,766

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

JEFFREY D. CRENSHAW,
*Appellant*.


MEMORANDUM OPINION

Appeal from Rice District Court; STEVEN E. JOHNSON, judge. Opinion filed June 15, 2018. Convictions affirmed, sentence vacated in part, and remanded with directions.

*Kai Tate Mann*, of Kansas Appellate Defender Office, for appellant.

*Jodi Litfin*, assistant solicitor general, and *Derek Schmidt*, attorney general, for appellee.

Before BRUNS, P.J., HILL, J., and WALKER, S.J.

PER CURIAM:  Jeffrey D. Crenshaw directly appeals his convictions and sentences on four counts of aggravated indecent liberties with a child; one count of attempted aggravated criminal sodomy with a child; and one count of aggravated criminal sodomy. All counts alleged the child victim was under age 14. We find no errors in trial proceedings requiring reversal and therefore affirm Crenshaw's convictions. However, we find the district court erred by imposing lifetime postrelease supervision at Crenshaw's sentencing hearing and remand for correction of his sentence.

1

FACTS

In April 2014, the State charged Crenshaw with five counts of aggravated indecent liberties with a child under the age of 14; one count of attempted aggravated criminal sodomy with a child under the age of 14; and one count of aggravated criminal sodomy with a child under the age of 14. In June 2016, a jury trial was held in the case. The evidence presented was lengthy and will be set out in considerable detail to fully deal with the issues on appeal.

In July 2013, Chandra Lambert was driving her 13-year-old niece, A.S., home from her grandparents when A.S. told Chandra that A.S.'s stepfather, Crenshaw, had molested her. A.S. stated that Crenshaw had touched her inappropriately and that she had told her mother, Diane, about what happened. A.S. stated that she wanted Chandra to report Crenshaw to the police. Chandra testified that was the first time A.S. had told her about the incidents. Chandra did not ask nor did A.S. give Chandra any further details at that time.

Chandra discussed what A.S. had told her with Diane and A.S., and Chandra gave Diane the option to call the police. The next day, Chandra called the Sterling Police Department herself. She also testified she had A.S. go into her bedroom and write down her story. Chandra testified she did not tell A.S. what to include in the written statement.

Sterling Police Officer Nick Sowers responded to Chandra's report. He testified A.S. told him that Crenshaw had touched her butt over her clothes three or four times. Sowers testified that he wrote in his police report that A.S. stated that Crenshaw did not touch her under her clothes or make her take off her clothes. He testified A.S. told him it occurred in Lyons, Kansas, and in Hutchinson, Kansas, and that it had happened within the last few years until Crenshaw moved out a few months before.

2

Because Sterling police did not have jurisdiction, Officer Sowers contacted Lyons Police Lieutenant Russell Hammer. Hammer went to Sterling and conducted interviews with A.S., Chandra, and Diane. He also was given A.S.'s written statement.

Lieutenant Hammer testified that A.S. told him that Crenshaw touched her on numerous occasions in Lyons when she was between 11 and 13 years old. Hammer then arranged for A.S. to undergo an interview at the Child Advocacy Center in Salina, Kansas. Chelsea Sutton testified that she interviewed A.S. at the Center in July 2013. A.S. told Sutton the touchings by Crenshaw happened when she was 10 or 11 years old. A.S. stated it all happened in Lyons, which is in Rice County, except one incident when Crenshaw touched her butt in Hutchinson. After the forensic interview with Sutton, forensic nurse Karen Groot testified she conducted a medical examination.

During the trial, A.S. testified that several incidents occurred when she was nine years old and was living in Lyons. A.S. was living in a house with her mother, Crenshaw, her older brother, her younger sister, and her two stepsisters, who stayed there every other weekend. A.S. stated Crenshaw started to inappropriately touch her the summer before her fifth grade year, when her mother was recovering from knee surgery. A.S. told the jury her mother was taking pain medication that made it difficult for her to wake up. A.S. remembered thinking that her mother could not come help her because her mother was downstairs. The doctor had told her mother that she could not go up very many steps because of her knee.

In the first incident, in the middle of the night Crenshaw came into the bedroom that A.S. shared with her younger sister and asked A.S. to go into another room with him to talk. A.S. said that when she was alone with Crenshaw, he started talking about how her body was maturing and asked her if she was curious about the changes. Crenshaw then told A.S. to lift her shirt and bra, and he touched her breasts. Crenshaw then told her to take off her clothes, lie down on the bed, and spread her legs and vagina. He told her

that it was sexy and guys liked it. Crenshaw then heard something, told A.S. to put her clothes on, and left the room. A.S. testified that every time an incident like this happened, it ended when Crenshaw heard a noise in the house.

A.S. read her written statement into evidence and also testified about other times that the abuse occurred. At certain points, the details of her written statement differed from her trial testimony. For instance, she wrote down that the first instance occurred in the late afternoon and Crenshaw left the room after he touched her breasts, but at trial she testified that the first incident happened at night. A.S. wrote that, after the first instance, Crenshaw would continue having A.S. lift up her shirt and bra every day for the next couple of weeks.

A.S. described another time when she was reading a book on her brother's bed and Crenshaw came into the room, shut the door, and lay down next to her. Crenshaw then lifted A.S.'s chin and kissed her. She tried to move away, but he kept trying to kiss her. The following day, Crenshaw came into the room where A.S. was reading and sat down at her feet, but she ignored him. He then put himself between her legs, moved her hips closer to him, and started moving her up and down. A.S. stated that he then pulled down her pants and underwear and licked her "private spot," which she later clarified meant her vagina. He asked her if she liked it, and A.S. said she did not know because she did not want to say "no" and make him mad or hurt his feelings. Crenshaw then left the room because he wanted to check to see if someone was coming. The written statement indicated she had similar interactions with Crenshaw every night over the next week.

On another occasion, Crenshaw came into A.S.'s bedroom and told her to pull down her pants and spread her legs. Crenshaw made A.S. bend over and put her hands on the bed. A.S. stated that she did not know what he used, "but he ran something up [her] butt." A.S. later testified that she was pretty sure it was his penis, but she did not want to

4

admit it at the time. She added that this incident ended after he heard a noise and left her bedroom.

Finally, A.S. described an incident while she was in the living room with Crenshaw watching television. She stated he asked her to sit next to him on the couch and, when she did, he grabbed her arm. When A.S. tried to pull away, Crenshaw overpowered her and put her hand between his underwear and shorts on his penis and made her squeeze and move her hand back and forth. In the forensic interview, A.S. stated that she told her mom after the incident on the couch what Crenshaw had been doing. A.S. testified that the incidents with Crenshaw eventually stopped after she told her mother, but her mother did not contact law enforcement. A.S. told the forensic interviewer that she told her mother again the next year, but her mother took no action to notify authorities.

During the forensic interview, A.S. told Sutton that she had trouble with dates and times and that she was not sure if she had the exact order of events recorded correctly in her written statement. A.S. testified that she could not count on both her hands how many times Crenshaw had inappropriately touched her and that the abuse occurred during the day and night; and she described some instances as occurring in the middle of the night, around 3 a.m. A.S. also stated that Crenshaw always asked her if she liked it, but A.S. felt she could not say no because she did not want to make him mad or get into trouble. Finally, A.S. stated that Crenshaw told her not tell anyone and acted like it was their secret.

The dates and A.S.'s age during the incidents remained in dispute at trial. A.S. had told Lieutenant Hammer that the incidents occurred around several landmarks in her life.

First, she stated that it occurred when her mother had knee surgery. Lieutenant Hammer admitted he did not do an independent investigation to determine when Diane

5

had knee surgery, but the State determined Diane had knee surgery in October 2010. The defense refuted this claim and presented medical records that Diane underwent surgery in late September 2010.

Second, A.S. stated that the abuse occurred while her mother was working at Casey's General Store. Diane's employment records showed she worked at Casey's between December 2010 and January 2011. During the forensic interview, A.S. stated that the abuse occurred the summer before her fifth grade year. The defense admitted A.S.'s school records into evidence which showed A.S. was in the fifth grade between 2010 and 2011.

Finally, A.S. told Lieutenant Hammer that Crenshaw was working at the jail when the molestation occurred. Crenshaw testified that he worked at the Rice County Detention Center between January 2010 and March 2011. Additionally, Crenshaw's long-time friend, Scott Kirkland, testified that he helped the family move from Lyons to Hutchinson in August 2011.

On cross-examination, Lieutenant Hammer testified he interviewed Crenshaw in August 2013. Hammer testified that Crenshaw had a normal demeanor and denied inappropriately touching A.S. Hammer stated that Crenshaw denied having touched A.S. sexually 11 times during the interview. He also testified that Crenshaw disclosed that he once accidentally saw the girls naked but that was because they were leaving the house and he wanted them to hurry and get dressed.

Crenshaw testified on his own behalf at trial. He denied sexually abusing or molesting A.S. Crenshaw stated that he lived in Lyons from January 2010 until August 2011. He stated he married Diane in July 2010. Crenshaw testified he was working at the jail when Diane underwent her knee surgery. According to his time sheet, Crenshaw did not work between September 30, 2010, and October 4, 2010. Also, Crenshaw typically

6

worked from 3:30 p.m. until 11:30 p.m. Crenshaw conceded, based on his time sheet, he never worked past midnight.

The defense presented evidence that A.S. alleged she was sexually abused when she was four years old. Crenshaw also called four witnesses—his ex-wife, his daughter, his sister, and a stepcousin—who testified that A.S. was observed joking around with Crenshaw and did not appear withdrawn from him during the time period of the alleged abuse. Crenshaw's daughter, K.S., testified that she stayed at the house in Lyons every other weekend, and A.S. never mentioned any inappropriate behavior by Crenshaw and she never saw her father touch A.S. inappropriately. On cross-examination, K.S. stated that she and A.S. did not necessarily share secrets but the two did talk when she stayed at the house.

Following the jury trial, Crenshaw was convicted of all seven charges filed against him. Crenshaw subsequently filed a motion for a new trial alleging the existence of newly discovered evidence. At the sentencing hearing, the district court first took up the motion. The court denied Crenshaw's motion for a new trial, finding first, that Crenshaw did not use reasonable diligence to discover the evidence during trial and second, the evidence was cumulative and did not have a reasonable probability to change the results. At sentencing, the district court did not sentence Crenshaw on one aggravated indecent liberties conviction but on the remaining charges sentenced him to six concurrent hard 25 sentences. The district court also imposed lifetime postrelease supervision. Crenshaw has timely appealed from his convictions and sentences.

ANALYSIS

Crenshaw raises five separate areas where he believes errors were committed in the district court. We will carefully review each of his complaints in turn.

7

*The time frame of the charges in jury instructions*

Crenshaw first argues the district court erred in instructing the jury that he committed the crimes against A.S. by using an overly broad time frame.

An appellate court typically reviews alleged jury instructional errors under a four step approach:

> """(1) First, the appellate court should consider the reviewability of the issue from both jurisdiction and preservation viewpoints, exercising an unlimited standard of review; (2) next, the court should use an unlimited review to determine whether the instruction was legally appropriate; (3) then, the court should determine whether there was sufficient evidence, viewed in the light most favorable to the defendant or the requesting party, that would have supported the instruction; and (4) finally, if the district court erred, the appellate court must determine whether the error was harmless, utilizing the test and degree of certainty set forth in *State v. Ward*, 292 Kan. 541, 256 P.3d 801 (2011), *cert. denied* 565 U.S. 1221 (2012).'" [Citation omitted.]" *State v. Fisher*, 304 Kan. 242, 256-57, 373 P.3d 781 (2016).

The parties agree that Crenshaw did not object to the jury instructions he now challenges as error. In light of this, we will review the instructions utilizing the clear error standard. See K.S.A. 2017 Supp. 22-3414(3); *State v. Brown*, 306 Kan. 1145, 1164, 401 P.3d 611 (2017). The clear error standard is a two-step review which requires "[this court to] first determine whether the instructions were legally and factually appropriate, employing an unlimited review of the entire record. If error is found, 'the defendant must firmly convince the court the jury would have reached a different result without the error.' [Citations omitted.]" 306 Kan. at 1164.

Crenshaw does not argue the instructions were legally inappropriate; thus, our review is limited to determining whether the instructions were factually appropriate.

Specifically, Crenshaw argues the time frame included in the instructions prejudiced the defense because it required him to defend against an overly broad time frame and allowed the State to present additional evidence that made A.S.'s statements appear more credible.

Generally, "[w]hen analyzing whether the instruction was factually appropriate, we '"should determine whether there was sufficient evidence, viewed in the light most favorable to the defendant or the requesting party, that would have supported the instruction."' [Citations omitted.]" *State v. Davis*, 306 Kan. 400, 418-19, 394 P.3d 817 (2017).

The time frame that the district court used in the jury instructions was factually appropriate. As the State correctly notes, courts generally acknowledge that some uncertainty is permitted with determining the date of an alleged sex crime committed against a child victim. See *State v. Armstrong*, 238 Kan. 559, 562, 712 P.3d 1258 (1986).

The State charged Crenshaw with committing the alleged crimes within a two-year period of time: between February 5, 2010, and February 4, 2012. Notably, both the State and the defense proposed jury instructions using the same two-year time frame. Witnesses testified that A.S. first reported in July 2013 that Crenshaw touched her numerous times when she was between the ages of 10 and 13. In July 2013, A.S. was 13 years old; hence, A.S. would have been 10 years old in 2010. Thus, the district court instructed the jury according to the dates alleged in the complaint, the parties' proposed jury instructions, and congruently with evidence presented at trial.

In addition, the instructions required the jury to find the acts occurred in Lyons, Kansas, which is located in Rice County, and the evidence supported such a finding. Each party presented evidence, including witness testimony, that Crenshaw and A.S.'s family lived in Lyons between the summer of 2010 and early 2011. But even if the

district court had narrowed the date range in the instructions, the evidence supporting and refuting whether Crenshaw committed the acts in Lyons would not have changed.

Before and at trial, Crenshaw denied all allegations against him. A.S. testified and described how the abuse occurred, and the great majority of her testimony describing the abuse remained consistent with her prior statements, which were also presented at trial. A.S. testified that the abuse began when she was nine years old. In closing argument, the defense argued the jury should not find A.S. credible based on her inconsistencies in describing the dates and her ages when the alleged abuse occurred. Based on the verdict, the jury found A.S. credible despite the date and age discrepancies. Because of this, we are not firmly convinced that a narrower time frame in the jury instructions would have caused the jury to reach a different result.

*Allegations of prosecutorial error*

Crenshaw next argues the prosecutor committed error in cross-examination when questioning Crenshaw about his attire. Crenshaw then argues the prosecutor committed five separate errors during closing argument that misstated the evidence and bolstered A.S.'s credibility.

The Kansas Supreme Court has explained our duty when prosecutorial error is alleged:

> "When analyzing a claim of prosecutorial error, we employ a two-step process. First, we determine whether error occurred. If there was error, the second step is to determine whether prejudice resulted. Under the first step, we analyze whether the prosecutor's acts fell outside the wide latitude afforded prosecutors. At the second stage of the analysis, we focus on whether the error prejudiced the defendant's due process rights to a fair trial. If a due process violation occurred, we assess prejudice by applying the *Chapman* constitutional error standard. *Chapman v. California*, 386 U.S. 18, 24, 87 S.

10

Ct. 824, 17 L. Ed. 2d 705 (1967). Under *Chapman*, "'prosecutorial error is harmless if the State proves beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial in light of the entire record, *i.e.*, where there is no reasonable possibility that the error contributed to the verdict.' [Citation omitted.]" *State v. Sean*, 306 Kan. 963, 973-74, 399 P.3d 168 (2017).

Every charge of prosecutorial error is fact specific, and any appellate test for prejudice must likewise allow the parties the greatest possible leeway to argue the particulars of each individual case. *State v. Sherman*, 305 Kan. 88, 110, 378 P.3d 1060 (2016). Additionally, we note the two-part prosecutorial error test has recently been applied to a prosecutor's questioning of a witness during trial. See *State v. Kleypas*, 305 Kan. 224, 323-24, 382 P.3d 373 (2016), *cert. denied* 137 S. Ct. 1381 (2017); *State v. Kemp*, No. 115, 812, 2018 WL 671182, at *8-9 (Kan. App. 2018) (unpublished opinion), *petition for rev. filed* March 5, 2018.

Crenshaw complains that the prosecutor improperly questioned him on cross-examination regarding his clothing. The following questions and answers occurred towards the end of Crenshaw's cross-examination:

"Q. [The State:] Now I notice that, during the majority of the trial, you have been wearing shirts with ties?

"A. [Crenshaw:] Yes, sir.

"[The State:] *How come you dressed in a plaid shirt without a tie today?*

"[Crenshaw:] Because the jail—they only gave me one tie and it didn't match, and I didn't really want to come up here looking like an idiot not matching like I'm colorblind, so I just went without a tie today.

"[Prosecutor:] Okay. *It's not because most of the jurors wear plaid shirt[s] without ties you were trying to be in sympathy with them?*

"[Crenshaw:] No, no, they gave me one tie, and he said you could find one tie. He's got it in his pocket. It's black and silver and it doesn't match, so I didn't want to look like an idiot.

11

"[Prosecutor:] All right. I was just curious, because it kind of seemed out of place."
(Emphasis added.)

Crenshaw concedes he did not object, and the State argues he did not preserve the evidentiary issue for this court's review.

"Generally [appellate courts] do not require a contemporaneous objection to preserve issues of prosecutorial error for appellate review. However, 'in accordance with the plain language of K.S.A. 60-404, evidentiary claims—including questions posed by a prosecutor and responses to those questions during trial—must be preserved by way of a contemporaneous objection for those claims to be reviewed on appeal.' But we will review a prosecutor's comments made during voir dire, opening statement, or closing argument on the basis of prosecutorial error even without a timely objection, 'although the presence or absence of an objection may figure into our analysis of the alleged misconduct.' [Citations omitted.]" *Sean*, 306 Kan. at 974.

Crenshaw argues the prosecutor's inquiry about his clothing was irrelevant and was, in effect, an improper comment on his credibility. Assuming the State's question was solely irrelevant or unduly prejudicial, the defendant must normally lodge a specific contemporaneous objection below to preserve this claim for review. See *State v. Hilt*, 299 Kan. 176, 192, 322 P.3d 367 (2014); *State v. McCormick*, 305 Kan. 43, 47, 378 P.3d 543 (2016). But the prosecutor's comment likely amounts to something more serious than an evidentiary error.

Crenshaw argues that the comment attacks his credibility because it implies he dressed similar to the jurors to gain their favor. Prosecutors are prohibited from expressing personal opinions on the credibility of a witness because such comments are "*unsworn, unchecked testimony*, not *commentary on the evidence of the case*." *State v. Pabst*, 268 Kan. 501, 510, 996 P.2d 321 (2000).

12

Crenshaw cites two cases in support of his claim that the prosecutor commented on his credibility, but the cases are distinguishable. In *State v. Marshall*, 294 Kan. 850, 857, 281 P.3d 1112 (2012), the defendant argued that the prosecutor improperly stated during closing argument that a particular witness was an honest person. Our Supreme Court held that the prosecutor's comments improperly bolstered the witness' credibility, i.e., his ability to tell the truth. But the prosecutorial comments frowned on in *Marshall* are different from those in our case because Marshall's prosecutor directly commented on a witness' truthfulness. The remarks in *Marshall* were not the kind of facetious innuendo we are dealing with, i.e., an insinuation that the defendant's attire was specifically chosen to evoke sympathy from the jury.

The other case relied on by Crenshaw is *State v. Fewell*, 286 Kan. 370, 386-87, 184 P.3d 903 (2008). Fewell argued the prosecutor improperly asked a law enforcement officer to comment on the defendant's credibility. The Kansas Supreme Court did not address the issue, however, because the issue was an evidentiary, not a prosecutorial error, issue and Fewell did not object below. 286 Kan. at 388-89.

Though Crenshaw does not directly raise the issue on appeal, we are concerned that the prosecutor's question may have inflamed the passions and prejudices of the jurors and, as such, would constitute prosecutorial error. As our Supreme Court has stated:

> "A juror must decide a case on evidence and controlling law, not on sympathy, emotion, or prejudice. Therefore, prosecutors are not allowed to make statements that inflame the passions or prejudices of the jurors or distract the jurors from their duty to make decisions based on the evidence and the controlling law. This means that a prosecutor has a duty to refrain from making improper, leading, inflammatory, or irrelevant statements to the jury and must guard against appeals to jurors' sympathies or prejudices." *State v. Holt*, 300 Kan. 985, Syl. ¶ 1, 336 P.3d 312 (2014).

Here, the prosecutor's questioning about Crenshaw's decision to wear a plaid shirt and no tie was both a red herring and a maladroit appeal to the jurors' prejudices which risked the danger of distracting the jurors from their duty to make their decision based on the evidence. Thus, we must now analyze whether the question survives the harmless error test.

Because Crenshaw challenges the prosecutor's questioning which occurred during cross-examination, we assess the error under the constitutional harmlessness test. See *Kemp*, 2018 WL 671182, at *8-9 (finding improper question reviewed under constitutional standard, whereas challenge to answer likely reviewed under nonconstitutional statutory harmless test). Accordingly, the "'prosecutorial error is harmless if the State proves beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial in light of the entire record, *i.e.*, where there is no reasonable possibility that the error contributed to the verdict.'" *Sean*, 306 Kan. at 973-74.

Contrary to the State's arguments on appeal, we believe the prosecutor's questioning of Crenshaw during cross-examination had the tendency to divert the jury's attention away from the evidence and invited the jury to find Crenshaw's decision to dress similar to the jurors to be prejudicial to his testimony. See *Holt*, 300 Kan. 985, Syl. ¶ 1. However, we also conclude that the error was likely harmless in light of the entire record as a whole. Though the prosecutor's question indirectly challenged Crenshaw's veracity, Crenshaw was given the opportunity to explain why he chose to wear a plaid shirt and no tie. Ironically, his sensible explanation, that his selection of clothing was dictated by his lack of choices and the fact of his incarceration, had the likely effect of reducing the prejudicial impact of the prosecutor's improper questioning.

Additionally, this case required the jury to make a credibility determination between A.S. and Crenshaw. The jury heard all the evidence in support of and against the

14

charges filed against Crenshaw. The jury heard that Crenshaw denied all allegations before and at trial. During closing arguments, the defense challenged A.S.'s credibility due to her failure to immediately report the abuse, her potential motive to lie about the abuse, and the inconsistencies in her statements. The jury also heard A.S.'s testimony and statements, which contained some discrepancies as to her age and the year when the abuse happened. The jury was presented with A.S.'s written statement, forensic interview, and testimony describing the specific instances of abuse. Overall, A.S.'s testimony and prior statements remained mostly consistent. During closing argument, the prosecutor reminded the jury that it must determine who it believed when deciding the case, A.S. or Crenshaw. In addition, in closing rebuttal the prosecutor told the jury to acquit if it believed Crenshaw, not A.S. Thus, we have concluded that the prosecutor's error in questioning Crenshaw about his decision to dress similar to the jurors was not prejudicial in light of the record as a whole.

Crenshaw next asserts that the prosecutor committed five errors during the closing argument by making comments which misstated the evidence and improperly bolstered A.S.'s credibility.

Once again, Crenshaw made no contemporaneous objection to the State's alleged errors during closing argument. But we review claims of prosecutorial error during closing argument regardless of whether the defendant raised a contemporaneous objection. *State v. Pribble*, 304 Kan. 824, 831, 375 P.3d 966 (2016).

In determining whether a prosecutor has misstated the evidence during closing arguments, Kansas courts hold:

> "Prosecutors enjoy wide latitude in crafting closing arguments. This latitude
> allows a prosecutor to make reasonable inferences based on the evidence, but it does not
> extend so far as to permit arguing facts not in evidence. For instance, '[p]rosecutors are

not allowed to make statements that inflame the passions or prejudices of the jury or distract the jury from its duty to make decisions based on the evidence and the controlling law.' Arguments must remain consistent with the evidence. If they are not, the first prong of the prosecutorial misconduct test is met, and an appellate court must then consider whether the misstatement prejudiced the jury against the defendant and denied the defendant a fair trial. [Citations omitted]" *State v. Killings*, 301 Kan. 214, 228, 340 P.3d 1186 (2015).

Additionally, our Supreme Court has held that it is "'improper for a prosecutor to attempt to bolster the credibility of the State's witnesses.'" *State v. Sprague*, 303 Kan. 418, 428, 362 P.3d 828 (2015) (quoting *State v. Donaldson*, 279 Kan. 694, 708, 112 P.3d 99 [2005]). However, we must afford prosecutors wide latitude to explain to "'juries what they should look for in assessing witness credibility, especially when the defense has attacked the credibility of the State's witnesses.'" *Sprague*, 303 Kan. at 428-29 (quoting *State v. McReynolds*, 288 Kan. 318, 325, 202 P.3d 658 [2009]).

In addition, when a case develops that turns on which of two conflicting stories is true, it may be reasonable to argue, based on evidence, that certain testimony is not believable. "'However, the ultimate conclusion as to any witness' veracity rests solely with the jury.'" *State v. King*, 288 Kan. 333, 352, 204 P.3d 585 (2009) (quoting *State v. Pabst*, 268 Kan. 501, 507, 996 P.2d 321 [2000]). A prosecutor may also comment during closing arguments regarding the witness' motivations to be untruthful. But a prosecutor must do so by basing the comment on evidence and reasonable inferences drawn from that evidence and without stating his or her own personal opinion concerning a witness' credibility or accusing a witness or defendant of lying. *State v. Armstrong*, 299 Kan. 405, 427, 324 P.3d 1052 (2014).

Crenshaw argues that the prosecutor misstated the evidence and bolstered A.S.'s credibility five different times during the closing arguments. First, Crenshaw argues the

16

prosecutor committed error in stating that A.S. did not have the life experiences to come forward and immediately report that the abuse occurred. The prosecutor stated:

> "[A.S.] didn't have sex education. Fifth graders don't have that. She explained that. She had no point of reference to—she had very limited life experience. She—she knew in the back of her mind that something was wrong, but she couldn't explain it, and she didn't know what to do with it. That's why she didn't immediately go forward, and she explained to you the best she could. But as she got older and as she looked back and as she got out of the situation, that's when it all started coming together. She started to have the life experience to know, oh, my gosh, I can't—that was what was happening. He was touching me that way."

The prosecutor's comments were based on A.S.'s statements in the forensic interview and her testimony. A.S. testified that the first time the abuse happened, she did what Crenshaw told her to do but she was confused and uncomfortable. In the forensic interview, A.S. stated that she did not really understand what inappropriate touching meant until she got older. A.S. also stated: "It's harder to think about it now, because back then I didn't—I knew something was wrong, but I mean, I was nine years old. I didn't know how bad it was, and now I know. I know how awful it was, and I know what it's done to me." Because the prosecutor's comment was based on A.S.'s statements and reasonable inferences drawn from the evidence, the prosecutor did not err. See *Killings*, 301 Kan. at 228.

Second, Crenshaw argues the prosecutor misstated the evidence in making comments that inferred Crenshaw took affirmative steps to isolate A.S. from her family. The prosecutor stated:

> "The fact that the defendant, Jeffrey Crenshaw, every time there was the slight noise—you notice how fearful he was of having someone walking in on them. He was very careful to make sure there were no other witnesses. You shouldn't hold it against [A.S.] because there's no other witnesses, because who controlled that? Jeffrey Crenshaw

17

did. Every time there was a possibility that somebody may be coming up the stairs or somebody may be coming, no, remember what he did? Every single time, put down your shirt, and he would walk out, and he would go check to see if someone was coming. He was very careful to make sure that this was—there was not going to be any other witnesses, and there weren't. He succeeded. He did a very good job of making sure that [A.S.] was on her own, kept her isolated. It's just her and him, and that's why you got to decide who do you believe. Do you believe the guy that made sure that everything was locked down to where you had to rely on a 15-year-old statement five years after the things occurred? Sure, he's going to have the upper hand, but who do you believe?"

A.S. stated that almost every incident of abuse ended when Crenshaw heard a noise or went to check to see if someone was coming. A.S. generally described that when the abuse occurred, she was alone with Crenshaw. The first time it happened, Crenshaw told A.S. to leave the bedroom she shared with her sister and go into her stepsisters' empty bedroom. Thus, there was evidence that Crenshaw acted in a manner to get A.S. alone with him. Another time, Crenshaw approached A.S. while she was reading in her brother's bedroom. A.S. testified Crenshaw closed the door, and the abuse ended when he left to see if someone was coming. Once again, because the comments were based on A.S.'s testimony, we find no prosecutorial error.

Third, Crenshaw argues the prosecutor improperly bolstered A.S.'s credibility in stating that she did not make inconsistent statements:

"She's not been inconsistent. It's just that you're not going to get everything from her if she doesn't trust you. Remember—and she even explained why she was doing that. She just wanted you all—people to know just enough so that she didn't have to feel awful and dirty and relive those moments. She just wanted to say enough so that something hopefully would happen. Now we're here."

Based on A.S.'s testimony and prior statements, the prosecutor was explaining how the jury should assess her credibility. We believe the comment was a reasonable

18

inference from the evidence. In context, the prosecutor was addressing how A.S.'s descriptions of the abuse changed and expanded over time from when she first reported it to the police. The defense cross-examined A.S. specifically on her varied statements to Officer Sowers, Lieutenant Hammer, Nurse Groot, and Sutton with the Child Advocacy Center. For the most part, A.S.'s written statement, forensic interview, and testimony describing the specific instances of abuse remained consistent.

Additionally, the prosecutor's statement that A.S. wanted to disclose just enough to make sure something would happen does not misstate the evidence. During the forensic interview, A.S. stated that talking about the abuse made her feel disgusting and worse. A.S. described how she had trouble talking about it with her mother: "[W]hen I told my mom the first time . . . I was sitting in front of [Crenshaw's] chair, like, and I was like bawling my eyes out, like, and she was laying on the love seat and I just, like, told her everything, like that I felt semi-comfortable saying." Also, the evidence indicated that A.S. wanted to disclose the abuse to law enforcement. A.S. stated she told her mother about the incidents twice and, though the abuse stopped, her mother did not contact law enforcement and A.S. felt like nothing happened. When Chandra called law enforcement, it was the result of A.S. telling her to report it to the police. Thus, the prosecutor's comments were not error.

Fourth, Crenshaw asserts the prosecutor misstated the evidence by remarking that A.S. disclosed the allegations when she was 10 years old and by implying that A.S. made the disclosures to get Crenshaw out of the house. The evidence showed that A.S. did not disclose the abuse to law enforcement until she was 13 years old. Additionally, the defense presented evidence that A.S. had run away from home and that she may have fabricated the allegations against Crenshaw. The prosecutor was certainly entitled to respond to the defense's contentions. To do so, the prosecutor stated:

"This is the first time that [A.S.] had the courage to finally—to stand up to a 40-year-old man who was her stepfather, who was a jailer, a person in position of authority, and she finally said no. Did he respect that? No. He kept telling her to come over, telling her to come over. She finally gave in. He grabbed her hand, put it in his pants, and remember, specifically, it was between the outer pants and his underwear. Now if [A.S.] was just making this up, why not just go for broke and just say, oh, we have put it inside his underwear and make it as bad as it can be? If she was making this up, why not just say that? Wouldn't that be easier? Wouldn't that seem worse? *If you're trying to get him out of the home, that would seem like the better story to make up, wouldn't it?* But she didn't. That's pretty weighty, and you give that a lot of weight. It's details like that throughout this whole case that should weigh on your mind where you say, you know, *I don't think a ten year old would make that up.* It's too specific where it's something outside of their knowledge."

The prosecutor's description of the specific instance of abuse is consistent with A.S.'s testimony. In context, the prosecutor discussed how much weight the jury should afford A.S.'s testimony and responded to the defense's potential claims that A.S. had a motive to fabricate the allegations of abuse. Also, the comments explained how the jury should weigh A.S.'s testimony due to specific details she used to describe this instance of abuse. Thus, the comments were a reasonable inference based on the evidence, and explained how the jury could view one of the two conflicting stories. See *Sprague*, 303 Kan. at 428-29; *Armstrong*, 299 Kan. at 427; *King*, 288 Kan. at 352.

Arguably, the prosecutor here may have misstated the evidence regarding A.S.'s age at the time of the disclosures. From the evidence, A.S. did not disclose the abuse to authorities until she was 13 years old. Because of this misstatement, we must determine whether the error prejudiced Crenshaw at the trial. Once again, we may find a prosecutorial error harmless if the State proves beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial in light of the entire record, i.e., where there is no reasonable possibility that the error contributed to the verdict. See *Sean*, 306 Kan. at 973-74.

20

As the State points out, A.S. had to recall the abuse later as a 13- and 16-year-old, but her memory was based on her experiences as a 9- or 10-year-old. The jury also heard evidence that A.S. stated, at different times, that it occurred when she was between 9 and 13 years old. Further, A.S. told Sutton in the forensic interview that she had trouble with dates and times and that she was not sure if she had the exact order of events recorded correctly in her written statement. A.S. did not provide any dates or times in her written statement.

After careful consideration we find the prosecutor's error to be harmless and not prejudicial. Defense counsel clarified in closing argument that A.S. was not 10 years old when she disclosed the abuse, she was 13 years old and 15 years old. Additionally, the district court orally instructed the jury before closing arguments:

> "The closing arguments, which you're about to hear, are made by the attorneys to discuss the facts and circumstances in this case and should be confined to the evidence and to reasonable inferences that can be drawn therefrom. Neither opening statements nor the closing arguments are evidence, and any statements or arguments made by the attorney which is not based on the evidence should be disregarded."

Moreover, the prosecutor left the credibility determinations up to the jury. In closing rebuttal, the prosecutor acknowledged that the case came down to a credibility determination and advised the jury to acquit if the jury believed Crenshaw.

Additionally, though A.S. gave more details as the investigation progressed, the essence of her versions of specific instances of abuse that A.S. recalled at trial, in her forensic interview, and her written statement remained consistent. The defense challenged A.S.'s credibility based on her inconsistencies and her failure to immediately report the abuse. Based on the verdict, the jury found A.S. credible despite the inconsistencies.

21

Though the case involved conflicting dates and times, A.S. provided details from her life that established the time frame when the abuse occurred in Lyons, regardless of the age she stated. Without reiterating the evidence recited above, we find the record supports the contention that Crenshaw had the opportunity to commit the abuse based on A.S.'s statements and how old she was when she reported the abuse. Therefore, the prosecutor's comment that misstated A.S. as being 10 years old when she reported the abuse were ultimately harmless and did not prejudice Crenshaw's right to a fair trial.

Fifth and finally, Crenshaw argues the prosecutor improperly bolstered A.S.'s credibility in stating:

> "[B]efore they moved was the last incident that happened in the downstairs family room, and the incidents did get worse as the time progressed. *So you got to ask yourselves either [A.S.] is the most talented actress and has concocted this incredibly consistent story, or she actually lived it and she's just telling you what she actually remembers from those incidents with Jeffrey Crenshaw*. Who do you believe? Because if you believe [A.S.], you should convict him of each and every count, each and every one." (Emphasis added.)

Crenshaw argues that the comment presented the jury with a "false choice" designed to make A.S.'s testimony appear more credible. But Crenshaw provides no legal authority why the prosecutor's comment was error. The State argues Crenshaw has waived and abandoned his argument because he does not provide any legal authority to support his claim.

Generally, the failure to support an argument with pertinent authority is akin to failing to brief the issue. An argument that is not supported with pertinent authority is deemed waived and abandoned. *State v. Tague*, 296 Kan. 993, 1001, 298 P.3d 273 (2013). Thus, Crenshaw may have waived his claim on appeal.

Although Crenshaw does not cite to *State v. Britt*, 295 Kan. 1018, 1029, 287 P.3d 905 (2012), his claim of false choice and bolstering the credibility of a witness is similar to issues raised in that case. The prosecutor in *Britt* stated:

> "'I am asking you to assess the credibility of a nine-year-old girl, now 11, and it's just that simple. It's this simple. She's either telling you the truth, in which case she's a victim of a horrible crime and he's guilty, or she's a lying, manipulative, conniving, creative, vindictive, evil child, who's accused this man right here of the most heinous of crimes, and he's innocent. It's one of the two. There are no shades of gray on this, folks. There is no middle ground.
>
> 'And once you decide those things about [A.C.], either she experienced these things and she's is a victim, or she's the most evil manipulating person you have ever seen. Because, again, there is no middle ground.'" 295 Kan. at 1028.

The Supreme Court found that the prosecutor's statements misstated the options available to the jury and led it to believe it had no choice but to find the victim entirely credible. 295 Kan. at 1029.

But the comments by the prosecutor in our case are significantly distinguishable from those in *Britt*. The prosecutor here did not remove the jury's choice regarding A.S.'s credibility. Rather, the prosecutor's comments were based on the evidence that A.S.'s prior statements and testimony describing the abuse remained consistent. Also, the comment related to which of two conflicting stories were believable: Either A.S. had lied or she had experienced the abuse. See *King*, 288 Kan. at 352. Moreover, the prosecutor here left the option open for the jury to either believe A.S. or to believe Crenshaw despite A.S.'s consistent story. Thus, we cannot conclude that the prosecutor's comments were error.

But even if we would consider the prosecutor's comments to be in error, the error was harmless and did not result in prejudice to Crenshaw. Though the case came down to

two credibility determinations, the evidence demonstrates that Crenshaw had the opportunity to commit the abuse even while working at the jail. A.S. provided consistent details regarding the abuse committed against her in her written statement, forensic interview, and testimony. The jury, as the finder of fact, was presented with all of A.S.'s statements and the witnesses who testified to what A.S. stated when she disclosed the abuse to law enforcement. The jury found A.S. credible despite the inconsistencies. Also, the district court properly advised the jury that any arguments not supported by the evidence must be disregarded. Once again, we are persuaded any error of the prosecutor was harmless.

*Denial of the motion for a new trial*

In his next issue, Crenshaw argues that the district court abused its discretion in denying his motion for a new trial based on newly discovered evidence.

In his motion for a new trial, Crenshaw asserted that before trial he unsuccessfully attempted to speak to Eddie Harrison—A.S's maternal uncle—about the case. Crenshaw claimed Eddie contacted his defense counsel after the jury trial and stated, in relevant part, that he would testify that when A.S. and Diane lived with him: (1) he overheard Diane coaching A.S. and (2) A.S. threatened and reported Eddie touched her inappropriately after he disciplined her.

In addition, the motion contended that Eddie and A.S.'s maternal grandmother, Cindy Harrison, would each testify that A.S. did not talk to them about what happened and her behavior with Crenshaw, at that time, did not indicate Crenshaw had inappropriately touched her. Crenshaw argued the newly discovered evidence would change the result of a retrial because the testimony against A.S. came from biological relatives.

24

The district court denied the motion for a new trial because it held: (1) Crenshaw did not use reasonable diligence to discover the evidence during trial and (2) the evidence was cumulative and did not have a reasonable probability to change the results.

An appellate court reviews a district court's order denying motion for a new trial based on newly discovered evidence under an abuse of discretion standard. *State v. Warren*, 302 Kan. 601, 614, 356 P.3d 396 (2015). "'Judicial discretion can be abused in three ways: (1) if no reasonable person would have taken the view adopted by the trial court; (2) if the judicial action is based on an error of law; or (3) if the judicial action is based on an error of fact.'" *State v. Marshall*, 303 Kan. 438, 445, 362 P.3d 587 (2015) (quoting *State v. Mosher*, 299 Kan. 1, 3, 319 P.3d 1253 [2014]). The party asserting error bears the burden of demonstrating an abuse of discretion. *State v. Ashley*, 306 Kan. 642, 650, 396 P.3d 92 (2017).

The controlling statute provides: "The court on motion of a defendant may grant a new trial to the defendant if required in the interest of justice." K.S.A. 2017 Supp. 22-3501. To establish the right to a new trial based upon newly discovered evidence, a criminal defendant must establish: (1) that the newly proffered evidence could not have been produced at trial with reasonable diligence and (2) that the newly discovered evidence is of such materiality that it would be likely to produce a different result upon retrial. *Warren*, 302 Kan. at 615.

Crenshaw argues that the district court erred in requiring him to exhaust all efforts to locate the newly discovered evidence during the trial, which required that he show he exercised more than the *Warren* standard of "reasonable diligence."

In the motion for a new trial, Crenshaw asserted he exercised reasonable diligence because an investigator attempted to contact Eddie multiple times on six different days between the end of July 2015 and through mid-August 2015. Crenshaw argued the

25

investigator spoke with Eddie a few times and left multiple messages, but Eddie never returned the phone calls to discuss the case. Eddie did not contact Crenshaw's defense counsel until after the jury trial was completed.

Crenshaw contends that the district court held him to a standard beyond reasonable diligence. But the jury trial occurred in June 2016. The district court found Crenshaw made a great deal of effort to contact Eddie in making the phone calls in 2015 but held his efforts did not show reasonable diligence because Crenshaw stopped all efforts 10 months before the trial. The district court further found the evidence was not newly discovered because the witnesses were known relatives of A.S. and the defense did not take any other steps, other than the phone calls, or request a continuance to locate the testimony. Here, we cannot conclude that the district court required Crenshaw to exhaust all efforts. Instead, the district court simply held Crenshaw did not exercise reasonable diligence in attempting to contact Eddie before or during trial.

Crenshaw argues, however, that the evidence was newly discovered because the defense did not know both the witnesses' identities and the content of the testimony during trial. However, all the testimony proffered in the motion related to Eddie's and Cindy's past observations of A.S. before she disclosed the abuse to the police and Eddie's past observations of A.S. and her mother when the two lived with him after Crenshaw had moved out. Thus, the newly discovered evidence did not arise or come into existence during trial. Clearly, it could have been located before or during trial. See *State v. Smith*, 39 Kan. App. 2d 64, 67, 176 P.3d 997 (2008) (finding newly discovered evidence met first-prong because it came into existence after jury commenced deliberations).

We believe a reasonable person could have taken the view adopted by the district court in ruling on the motion. Thus, Crenshaw has failed to show the district court abused its discretion.

26

But even if we were to conclude that the district court erred in finding Crenshaw did not exercise reasonable diligence, the newly discovered evidence is not material in nature. Though the denial of the motion for a new trial is reviewed for an abuse of discretion, materiality decisions are reviewed de novo, with deference given to the district court's findings of fact. *State v. Rojas-Marceleno*, 295 Kan. 525, 539, 285 P.3d 361 (2012). To assess the materiality:

> "'[T]he district court must assess the credibility of the newly proffered evidence. Ordinarily, a new trial is not warranted when the newly proffered evidence merely tends to impeach or discredit the testimony of a witness. But, even when the evidence tends to impeach the testimony of a witness, the presence or absence of corroborating evidence is another factor to consider in determining whether the newly discovered evidence is of such materiality that it is likely to produce a different result upon retrial. [Citations omitted.]'" *Warren*, 302 Kan. at 615-16.

We will not reassess the district court's credibility determinations but rather will review the determination for an abuse of discretion. See 302 Kan. at 616.

As Crenshaw concedes, portions of the proffered newly discovered evidence was cumulative. The defense put on witnesses who testified that A.S. did not appear withdrawn from Crenshaw and that A.S. did not talk about the abuse. The fact that Eddie's and Cindy's testimony would come from a biological relative also does not present the evidence in a new light because the defense used to its advantage the fact that A.S. did not talk about the abuse to Chandra, her aunt, until July 2013. Therefore, the district court did not err in finding this portion of the evidence was cumulative.

Crenshaw argues that Eddie's testimony about overhearing Diane coach A.S. on what to say is not cumulative. Diane did not testify at trial. Thus, the admissibility of this proffered testimony is questionable under hearsay rules. Crenshaw argues that the testimony provides proof A.S. worked with Diane to fabricate the allegations and,

27

therefore, is not cumulative. But even if we assume the testimony to be admissible, Eddie's testimony tends to merely impeach or discredit A.S.'s testimony and would not warrant a new trial. See *Warren*, 302 Kan. at 616; *Rojas-Marceleno*, 295 Kan. at 542-43. The evidence also has low materiality because Diane did not testify. Thus, we see no error in the district court finding this particular proffered evidence immaterial.

Next, Crenshaw argues Eddie's testimony that A.S. threatened to and reported that he inappropriately touched her when he disciplined her while she was living with him at his home would put the allegations against Crenshaw in a new light, and the evidence goes directly to A.S.'s veracity. Eddie's proffered testimony tends to merely impeach or discredit A.S.'s testimony in challenging her motive for reporting the alleged abuse to police. See *Warren*, 302 Kan. at 615-16. Crenshaw argues on appeal, however, that the newly discovered evidence would establish A.S.'s tendency to make allegations against authority figures.

"'[E]ven when the evidence tends to impeach the testimony of a witness, the presence or absence of corroborating evidence is another factor to consider in determining whether the newly discovered evidence is of such materiality that it is likely to produce a different result upon retrial. [Citations omitted.]'" 302 Kan. at 615-16.

The materiality of this particular testimony is low. Here, the defense counsel admitted evidence that A.S. had alleged that she was sexually abused when she was four years old. The defense did not present any evidence that the past allegation resulted from an authority figure. A.S. also did not state nor did the defense argue that A.S. reported the abuse because of Crenshaw's discipline. Rather, A.S. reported the incidents in July 2013, after Crenshaw had moved out and was no longer in a position of authority with A.S.

In closing arguments, the defense specifically argued that A.S. did report the abuse to get away from Crenshaw. Also, A.S.'s forensic interview does not support that she

28

made the allegations based on Crenshaw's discipline. Instead, at one point A.S. was asked how she felt around Crenshaw. She explained that Crenshaw, as a parent, was mean and disciplined her more than her mother, but she did not make that statement in relation to why she reported the abuse to the police. Thus, Eddie's proffered testimony would not likely change the result on a retrial and, as stated above, tends to merely impeach or discredit A.S.'s testimony.

After fully considering the trial record and the proffered new testimony, we find that the district court did not abuse its discretion in denying Crenshaw's motion for a new trial based on newly discovered evidence.

*Cumulative error*

Crenshaw's argument on appeal contends that his convictions should be reversed based on the cumulative effect of the individual trial errors.

> "When a party argues that the cumulative impact of alleged errors is so great that they result in an unfair trial, this court aggregates all the errors and, even if those errors individually would be considered harmless, analyzes whether their cumulative effect is so great that they collectively cannot be determined to be harmless. In undertaking such an analysis, this court reviews the entire record and exercises unlimited review. One error is insufficient to support reversal under the cumulative error doctrine. [Citations omitted.]" *Sean*, 306 Kan. at 993.

"'[I]f any of the errors being aggregated are constitutional in nature, the cumulative error must be harmless beyond a reasonable doubt.'" *State v. Robinson*, 306 Kan. 1012, 1034, 399 P.3d 194 (2017) (quoting *State v. Tully*, 293 Kan. 176, Syl. ¶ 18, 262 P.3d 314 [2011]).

There is no cumulative error. The prosecutor committed three errors that we ultimately have found to be harmless and not resulting in prejudice: asking Crenshaw improper questions concerning his dress during cross-examination and twice misstating a witness' testimony which bolstered A.S.'s credibility during closing argument.

As we noted above, this case required the jury to make a credibility determination between A.S. and Crenshaw. The prosecutor's comments during cross-examination did relate to Crenshaw credibility, in part. But the prosecutor's closing argument ultimately left the credibility determination to the jury, and the prosecutor advised the jury to acquit Crenshaw if it believed his story. The prosecutor's comments throughout closing and closing rebuttal were based on the evidence or on reasonable inferences drawn from the evidence involving two conflicting stories. See *King*, 288 Kan. at 352. Moreover, A.S. consistently described the details of the specific instances of abuse. The jury was presented with all her prior statements and heard her testimony which contained inconsistencies. Additionally, the jury heard evidence that Crenshaw had the opportunity to commit the crimes against A.S. in Lyons despite his work schedule. Ultimately, the jury made a credibility determination in favor of A.S.

The touchstone in our determination is whether the defendant received a fair trial, not whether he received a perfect trial. See *State v. Kahler*, 307 Kan. 374, 405, 410 P.3d 105 (2018) We find that the three errors by the prosecutor, when considered together, did not have the cumulative effect of denying Crenshaw a fair trial. We are firmly convinced beyond a reasonable doubt that the verdicts against Crenshaw would not have changed if the errors had not been committed. Thus, his cumulative error allegation is without merit.

*The sentence requiring lifetime postrelease supervision*

As his final issue on appeal, Crenshaw argues and the State concedes that the district court erred in imposing lifetime postrelease supervision.

An appellate court may correct an illegal sentence at any time. K.S.A. 2017 Supp. 22-3504(1); *State v. Seward*, 296 Kan. 979, 991-92, 297 P.3d 272 (2013). Kansas statutes do not authorize district courts to impose a sentence of lifetime postrelease supervision on a hard 25 "indeterminate" sentence because the defendant is subject to mandatory lifetime parole. K.S.A. 2017 Supp. 22-3717(u); K.S.A. 2017 Supp. 21-6627(a)(1)(C) and (D); see *Seward*, 296 Kan. at 991-92.

In *State v. Cash*, 293 Kan. 326, 330-31, 263 P.3d 786 (2011), the Kansas Supreme Court held that a district court errs in imposing postrelease supervision on a defendant sentenced to a hard 25 indeterminate life sentence because only a parole board may release him or her from prison, and the release cannot occur from a court-ordered postrelease supervision. Thus, a district court cannot impose lifetime postrelease supervision, and the court vacated that portion of the defendant's sentence.

Here, the district court clearly erred by imposing lifetime postrelease supervision onto Crenshaw's hard 25 sentences. Thus, this portion of the sentence must be vacated, and the case will be remanded to the district court for correction of his sentence.

Convictions affirmed, sentence vacated in part, and remanded with instructions to vacate the defendant's sentence provisions requiring lifetime postrelease supervision.